473 F.2d 1344
 5 Fair Empl.Prac.Cas. 623, 5 Empl. Prac. Dec. P 8450
Robert ROCK et al., Appellants,
v.
NORFOLK AND WESTERN RAILWAY COMPANY, a corporation, et al., Appellees.
UNITED TRANSPORTATION UNION LOCAL NO. 974, AFL-CIO, an
unincorporated association, et al., Appellees,
v.
UNITED TRANSPORTATION UNION LODGE NO. 550, an unincorporated
association, United Transportation Union, an
unincorporated association, Appellants.
UNITED TRANSPORTATION UNION LOCAL NO 974, AFL-CIO, an
unincorporated association et al., Appellees,
v.
NORFOLK AND WESTERN RAILWAY COMPANY, a corporation, Appellant.
 Nos. 72-1777 to 72-1779.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 1, 1972.
Decided Feb. 13, 1973.
 
 Morris J. Baller, New York City, and Robert Belton, Charlotte, N. C. (Victor J. Ashe, Norfolk, Va., Jack Greenberg and William L. Robinson, New York City, on brief), for Robert Rock and others, appellants in No. 72-1777, and appellees in Nos. 72-1778 and 72-1779.
 James T. Turner, Norfolk, Va. (William C. Worthington and Williams, Worrell, Kelly & Worthington, Norfolk, Va., on brief), for appellee, Norfolk and Western Railway Co., in No. 72-1777, and for appellant, Norfolk and Western Railway Co., in No. 72-1779.
 Willard J. Moody, Portsmouth, Va. (Walton G. Bondurant, Jr., and Moody, McMurran & Miller, Portsmouth, Va., on brief), for United Transportation Union and United Transportation Union, Lodge No. 550, appellees in No. 72-1777 and appellants in No. 72-1778.
 Before HAYNSWORTH, Chief Judge, and WINTER and RUSSELL, Circuit Judges.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 These are three actions under the Civil Rights Act of 1964[1] instituted by the plaintiffs, both individually and as representatives of the class, and by their local union, to remedy alleged discrimination in employment at rail terminal yards operated by the defendant railroad at Norfolk, Virginia. Named as defendants along with the railroad are the local union representing the employees at the other terminal yard and the international union with which both locals are affiliated. It is the position of the plaintiffs that the defendant unions aided in the discrimination of which they complain.
 
 
 2
 At Norfolk, the railroad maintains two terminal yards, adjacent to one another. One is known as the Barney Yard and the other as the CT Yard. The plaintiffs are long-time black employees at the Barney Yard.[2] This yard, which covers a relatively small area of contiguous tracks, is exclusively concerned with the movement of loaded coal cars down an incline to certain mechanized dumpers which empty the coal into waiting vessels for transport abroad. The District Court found that there was no locomotive power and a minimum use of signaling connected with operations in this yard. On the other hand, the CT Yard, physically much larger than Barney and with a far more complex pattern of trackage, handles freight of every description, including coal. In that connection, its employees move rail traffic with diesel engines "in both directions into and out of a complex of industrial trackage, sidings, yards, stations, crossings, and the like".
 
 
 3
 So far as this litigation is concerned, the operating employees in both Norfolk yards are divided among brakemen, conductors, and car retarder operators. In both yards, the entering job is that of brakeman, with the opportunity to advance successively, according to ability and seniority within the particular yard, to the job of conductor and car retarder, at increasing rates of pay. The hourly or daily rates of pay have always been the same for Barney Yard and CT Yard employees. The employees in both yards are members of, and are represented by, the same international union and the conditions of their employment are governed by a single collective bargaining agreement. They are, however, grouped in separate union locals. Their seniority rights, also, attach only to the yard in which they were originally employed and are not exercisable in the other contiguous yard. Thus, an employee in the Barney Yard has seniority rights in that yard, dating from the time of his employment in that yard, but has no seniority rights in the CT Yard.
 
 
 4
 As a result of the employment practices followed by the defendant railroad, prior to 1965, the two yards were racially identifiable. To illustrate: In July, 1965, of the 176 brakemen employed at the Barney Yard, only 3 were white; on the other hand, but 3 brakemen out of the 302 employed at the CT Yard were black. This situation resulted from the "nepotistic" employment practices followed by the railroad at the two yards in the pre-1965 period. These practices were described in the findings of the District Court in these words:
 
 
 5
 "The few jobs that opened up were quickly filled without any active recruitment. Any Barney Yard job opening would be first known to the predominately black work force, which would provide black applicants, often relatives, immediately. The pay was good, the work relatively stable, and generally, railroad employment was prestigious in the community.
 
 
 6
 "The same hiring conditions also pertained in the CT Yard, where a predominately white work force provided white job seekers, again mostly family relatives, for scarce job openings.
 
 
 7
 "Such a nepotistic hiring provided two things. For the Railway, it supplied employees particularly interested in railroad work, employees grounded in railroading through long family connections with the industry. Such attributes were likely to provide, and did, a loyal, interested work force. For the Negroes, it provided a steady, prestigious job of equal pay to their white counterpart.
 
 
 8
 "As a somewhat vicarious result, it also provided the Railroad with a black and white work force in about equal percentage to the surrounding population-a result which, in most respects, might suit the general purport of the Civil Rights Act of 1964, except in one particular, that work force as to these 'brakemen' was largely segregated into blacks in the Barney Yard and whites in the CT Yard."
 
 
 9
 The plaintiffs contended that since 1965 there had been no substantial change in the hiring pattern followed by the defendant railroad and that the racial identification of the two yards had been, for that reason, substantially maintained. It was further their contention that the work at the CT Yard was more desirable and profitable than that in the Barney Yard. To remedy the disparity and discrimination in employment opportunities existing between the two yards by reason of the racial classification of the two yards, the plaintiffs asked the merger of the seniority rosters in the two yards as well as the merger of the two locals, along with back-pay relief and attorneys' fees.
 
 
 10
 The District Court, in a carefully prepared memorandum opinion, found that the defendant railroad had violated the Act by "the continued use of a hiring and job assignment procedure after 1965 which would tend (tended) to perpetuate the pre-1965 discrimination" and that it had taken no steps to correct the discriminatory results inherent in such hiring procedures. It further found that "to a degree there is discrimination in the barrier erected which now prevents promotion of Barney Yard men to certain higher job categories" and locked therein "with no access" to positions leading to that "of assistant yardmaster and yardmaster". It found, however, that the work in the Barney Yard was not, as plaintiffs argued, "dirtier or more menial" and concluded that the work in the two yards had such "small vestiges of similarity" as to constitute "an entirely different trade".
 
 
 11
 On the basis of such findings, it ordered the railroad to discontinue its "word-of-mouth" hiring practices and to establish a single employment office for both yards. To correct any prejudice sustained by black brakemen in the Barney Yard in promotion rights, it provided a means whereby such employees could qualify for promotion to conductor in either yard. It further ordered that the seniority rosters of the two yards be merged by "topping and bottoming" the two rosters and that the two union locals be merged. It concluded by denying back-pay and by granting attorneys' fees to plaintiffs' counsel in the sum of $15,000, payable two-thirds by the railroad and one-third by the defendant union.
 
 
 12
 All parties have appealed. The railroad and union attack the finding made against them of a violation of the Act. The union, also, complains that the special seniority rights granted the Barney Yard brakemen in qualifying for the conductors' roster discriminates unfairly against CT Yard brakemen who have qualified for such roster. The plaintiffs, on the other hand, by their appeal, object to the merging of the seniority rosters on a "topping and bottoming" basis as inadequate, and complain of the failure to grant any back-pay relief and of the inadequacy of the allowance by way of attorneys' fees.
 
 I.
 
 13
 The findings by the District Court that, in its hiring practices, the defendants had violated the Act, though challenged by the defendant railroad and the defendant union is not clearly erroneous and is accordingly affirmed.
 
 II.
 
 14
 There seems to be no dispute among the parties that, if the finding of a violation of the Act is sustained, some form of merger of the seniority rosters at the two yards is a proper remedy. The real issue in the appeal revolves about the manner in which, accepting such finding of a violation, the seniority rosters at the two yards should be merged. The District Court ordered what has been described in the record as a "topping and bottoming" merger. In this type of merger, each employee would retain his existing position on the seniority roster of the yard where he is presently employed and would be placed at the bottom of the roster in the other yard as of the date of the merger. This would mean the continuance of two seniority rosters, with each employee having different seniority standing on the different rosters; for example a Barney brakeman with ten years' seniority at such yard would retain that seniority in the Barney Yard but would acquire seniority at the CT Yard only as of the date of the merger. It is the contention of the plaintiffs that the result of such a form of merger would provide no actual relief for the older Barney Yard employees. Railroad employment is contracting and the opening up of new jobs is becoming increasingly rare. If a Barney Yard brakeman were to be relegated to the bottom of the seniority list at the CT Yard, it is unlikely that he would ever find an acceptable opening at the CT Yard which he could claim under the seniority rights that would be given him at the CT Yard.[3] For these reasons, the plaintiffs press for what they call a "dove-tailing" form of merger of the two seniority rosters. Such a merging would create a single terminal seniority roster for both yards, thereby permitting the employees at both yards to compete for any job vacancies at either yard on the basis of their terminal (as distinguished from yard) seniority, established by the date of their employment.
 
 
 15
 The rule is well-established that, where discrimination violations of the Act have been found, the remedy granted must eliminate all residual effects of past discrimination to the greatest extent practical. It cannot be gainsaid that the relief demanded by the plaintiffs would more effectively remove the effects of the illegal discrimination than that granted by the limited change made in the seniority systems in the two yards by the District Court. The railroad and the union would justify the more limited type of merger ordered by the District Court as necessary to the safe and efficient operation of the yards. They emphasize that the tasks in the CT Yard require greater and more specialized skills than do the simpler responsibilities in the Barney Yard. The District Court accepted this argument, finding, as has already been pointed out, that there were "small vestiges of similarity" in the work in the two yards. The difficulty with this finding is that it is contradicted both by the prior conduct of the railroad and by its admissions in the record that a "dove-tailing" of the seniority rosters in the two yards was practical. As a matter of fact, the qualifications for employment as a brakeman, the entering classification in both yards, are the same in both the Barney and the CT Yards. And the breaking-in period for a CT Yard brakeman, hired without prior experience, is a mere five and one-half days. If an inexperienced employee can qualify with such limited training, it is inconceivable that an experienced Barney Yard brakeman would be unqualified to work as a brakeman in the CT Yard, particularly since one official of the railroad stated that the duties of a brakeman in the two yards were "basically similar". Moreover, at various times during emergencies, Barney Yard employees have been transferred to work in the CT Yard. There was no suggestion by the railroad or the union that their work was unsatisfactory.
 
 
 16
 To meet the test of "business necessity" as an exception under the Act, an employment practice, such as the maintenance of separate seniority rosters in the contiguous yards in this case, "must not only foster safety and efficiency, but must be essential to that goal." (Italics in opinion.) United States v. St. Louis-San Francisco Railway Co. (8th Cir. 1972) 464 F.2d 301, 308, cert. den. 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700.[4] The record herein will not support a finding of business necessity, based on the application of this test, as a warrant for denying unto the plaintiffs a merger of the seniority rosters in the two yards into a single terminal roster, and such merger is an appropriate remedy under the circumstances of these cases. See, Robinson v. Lorillard Corp., supra, 444 F.2d at p. 798. A single terminal seniority roster would necessarily provide for the preservation of the rights of all incumbent employees at both yards and would permit no displacement of incumbent employees.[5] It would be limited in operation to bidding for future vacancies in either yard and, as plaintiffs concede, would remain subject to the overriding consideration of basic job competency.[6] With particular reference to the right of Barney Yard brakemen to qualify for promotion to conductors, any decree should, while protecting Barney Yard brakemen from prejudice in connection with promotion to this higher classification, not give such brakemen any higher or broader rights than those enjoyed or granted to CT Yard brakemen, who had qualified for promotion to conductors. Recognizing the complexities of railroad employment, the actual formulation of the specific terms and provisions of a merged terminal seniority roster, covering both yards, should be the task of the District Court, which could, before so doing, afford the parties themselves an opportunity to submit their own proposed "dove-tailing" merger plans. The cause will accordingly be remanded to the District Court with instructions to prepare, after hearing, a plan of merger of the two seniority rosters into a single seniority roster, comporting to the general principles hereinbefore stated.
 
 III.
 
 17
 For the same reasons that require the merger of the two seniority rosters at the yards, the District Court was clearly right in ordering a merger of the local unions covering the employees in the two yards. United States v. Jacksonville Terminal Company (5th Cir. 1971) 451 F.2d 418, 457, cert. den. 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815. Its action in this respect is affirmed.
 
 IV.
 
 18
 The plaintiffs take exception to the disallowance of back-pay. They contend that the opportunities for work and accordingly the earnings of the employees in the Barney Yard were less than in the CT Yard. They complain, also, that the chances for advancement in the two yards were different. The District Court, while making no specific findings of fact on this issue, was apparently influenced in the denial of back-pay by the speculative nature of such claims and by the fact that the railroad had itself suggested as early as 1967 a merger of the two seniority rosters, only to be thwarted by the reluctance of the union to agree. The railroad contended the agreement of the union was required for any such change in the collective bargaining agreement under the terms of the Railway Labor Act.[7] The plaintiffs suggest, in reply, that the offer of the railroad to merge the seniority rosters, made in 1967, was belated and followed the filing of a complaint by them with the EEOC. They, also, raise a question of the good faith of the railroad in making its offer. Since we have concluded that the plaintiffs are entitled to a more liberal form of merger of the seniority rosters, it will be appropriate for the District Court to consider anew the issue of the right of the plaintiffs to back-pay against either the railroad or the union, or both, and, in that connection, it should make specific findings on the conflicting claims of the parties on this issue.
 
 V.
 
 19
 The plaintiffs urge that the award of attorneys' fees, as made by the District Court, was too niggardly. The allowance of attorneys' fees in cases of this character are properly for the District Court, based on appropriate findings, and will be overturned only for clear error. In the award which was made, the District Court made no findings which disclose the basis of its award. But since these cases are being remanded for further proceedings, the District Court should make its award anew, taking into consideration the additional services of plaintiffs' counsel, including those relating to this appeal and the additional proceedings in the District Court. Findings to disclose the basis of the ultimate award should be made.
 
 
 20
 Affirmed in part and remanded in part with directions.
 
 
 
 [1]
 42 U.S.C. Sec. 2000e et seq
 
 
 [2]
 All of the individual plaintiffs were employees at the time of the filing of the action. Ezell Johnson, employed for many years by the railroad, retired after the action was begun
 
 
 [3]
 See United States v. The Chesapeake and Ohio Railway Company (4th Cir. 1973) 471 F.2d 582, decided December 26, 1972, involving two yards similar to those of the defendant railroad in these cases located at Newport News, Virginia. However, there were important differences in the cases. As the District Court remarked in its opinion in these cases, "In the C & O case, absolutely no hiring took place between passage of Title VII in 1965 and January 1, 1970. After employment was reactivated by C & O in January, 1970, the evidence presented in that case showed every affirmative effort on the part of the defendant, to recruit blacks for the formerly all-white yard and whites for the formerly all-black yard. * * * Such is not the situation, we find, in the case at bar."
 
 
 [4]
 See, also, Robinson v. Lorillard Corporation (4th Cir. 1971) 444 F.2d 791, 798, n. 7, cert. den. 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655:
 "It should go without saying that a practice is hardly 'necessary' if an alternative practice better effectuates the intended purpose or is equally effective but less discriminatory."
 
 
 [5]
 See Local 189, United Papermak. & Paperwork. v. United States (5th Cir. 1969) 416 F.2d 980, 987, n. 8, cert. den. 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed. 100
 
 
 [6]
 Cf., United States v. The Chesapeake and Ohio Railway Company, supra