The UNITED TRANSPORTATION UNION LOCAL NO. 974, AFL–CIO, an unincorporated association, Plaintiff,

Robert Rock et al., Appellants,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, a corporation, et al., Appellees.

No. 74–1788.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1975.

Decided Sept. 22, 1975.

Certiorari Denied April 19, 1976.

See 96 S.Ct. 1664.

---

Morris J. Baller, New York City (William T. Mason, Jr., Norfolk, Va., Robert Belton, Charlotte, N. C., and Jack Greenberg, New York City, on brief), for appellants.

James T. Turner, Norfolk, Va. (Williams, Worrell, Kelly & Worthington, Norfolk, Va., on brief), for appellee Norfolk and Western Railway Co.

Walton G. Bondurant, Jr., Richmond, Va. (Willard J. Moody, Moody, McMurran & Miller, Portsmouth, Va., and Robert Hart, Cleveland, Ohio, on brief), for appellees United Transp. Union Lodge No. 550 and United Transp. Union.

Before WINTER, CRAVEN and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

In a previous appeal, *Rock v. Norfolk and Western Railway Company,* 473 F.2d 1344 (4 Cir.), cert. denied, 412 U.S. 993, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973), we affirmed the district court's conclusion that the railroad (N & W) and the unions had engaged in hiring practices illegal under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* at the mostly black Barney Yard and the mostly white CT Yard in Norfolk, Virginia. We remanded the case, however, with directions to the district court (a) to prepare a plan for merger of the seniority rosters of each of the yards into a single seniority roster, (b) to consider defendants' liability for back pay, and (c) to make an allowance for attorneys fees. On remand, plaintiffs sought to raise, as an additional issue, the contention that minimum wage guarantees made to certain N & W employees when Nickel Plate Railroad was merged with N & W should be extended to them.

The district court declined to consider an upward adjustment of plaintiffs' monthly guarantees by reason of the Nickel Plate merger plan on the ground that since the claim was not asserted until final argument of the case on remand, the assertion was untimely. It ruled that plaintiffs were not entitled to back pay and it formulated a plan for merging seniority rosters.[1] Plaintiffs appeal a second time, challenging the correctness of the denial of back pay, the merger of the seniority rosters for conductors, and the refusal to give effect to the Nickel Plate merger agreements. We find merit in plaintiffs' several assertions of error, and therefore we vacate the judgment in the respects it is challenged and remand the case for further proceedings.

## I.

Because of the full statement of facts in the appeal previously reported, we proceed directly to the legal issues, reciting only such additional facts as are necessary for their full understanding. We consider first plaintiffs' claim to back pay.

Discrimination in hiring and employment practices has already been established in this case. Under the rule of *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975):

[G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. (Footnote omitted.) 422 U.S. at 421, 95 S.Ct. at 2373.

See also *Robinson v. Lorillard Corp.,* 444 F.2d 791, 803–04 (4 Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

The district court advanced four reasons for denying back pay. They were: (a) that the rate of pay for each classification at the Barney and CT Yards was identical; (b) in 1968, N & W offered to dovetail the rosters of the two yards, but this offer was refused by the unions and must have been known and acquiesced in by plaintiffs; (c) while promotions to higher paying positions came more slowly to Barney Yard employees than to CT Yard employees, the disparity resulted from objective employment needs and personal choice on the part of Barney Yard employees; and (d) the two yards are separate and distinct.

With the possible exception of extension of the N & W minimum wage guarantees, we think that a general application of any or all of the district court's reasons for denying back pay would frustrate the eradication of discrimination and would prevent the victims of discrimination from being made whole for their injuries. Therefore, we think back pay must be awarded.

Although rates of pay at the Barney and CT Yards are identical, it is total income, not rate of pay, by which discrimi-

---

1. It made other rulings also which we need not describe since they are not challenged on appeal.

nation in compensation is measured. Rate of pay is only part of the equation which produces total income. The record reflects that there was significantly less opportunity for work and for promotion, and significantly greater possibility of layoff at Barney than that at the CT Yard. Such opportunities and possibilities are among the "terms and conditions" of employment. When they are unequal and one racially identifiable group is favored over another, racial discrimination in fact has been practiced.

That no Barney Yard men applied for CT Yard jobs does not disprove discrimination or foreclose the back pay remedy. Since Barney Yard men had no seniority rights to exercise in applying or bidding for CT Yard jobs, 473 F.2d at 1346, a Barney Yard employee would be required to forfeit his accumulated seniority in order to obtain employment at the CT Yard. A refusal to commit seniority suicide is not an acceptable reason to deny back pay. Victims of discrimination should not be required to forfeit wage and security benefits accruing because of their seniority in order to remain eligible for purely speculative future back pay relief. A general rule requiring such action would frustrate the central purposes of Title VII.

Even if N & W did offer to dovetail seniority rosters in 1968, the fact is that dovetailing was not accomplished. Mere *bona fides* on the part of an employer, not translated into an actual eradication of discrimination, provides no defense to a claim for back pay. *Albemarle Paper Co.,* 422 U.S. at 422, 95 S.Ct. 2362; *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In any event, the record does not support the district court's suggestion that plaintiffs knew of the merger offer in 1968. There was affirmative testimony by representatives of the affected class that they had neither seen nor heard of the offer, and a union official testified that it had not been communicated to the black union or its officers. Under *Albemarle Paper Co.,* this purported justification is not a good defense.

The district court found that the disparate promotion rate between the two yards did not justify the back pay remedy. But as a result of "nepotistic" hiring practices, mostly blacks were hired at Barney and mostly whites at CT, and the system of seniority tended to lock blacks into Barney. See 473 F.2d at 1346. In light of the racial pattern of employment at the two yards, the disparate promotion rate, regardless of the identity in pay rates for identical classifications at the yards, made employment at the Barney Yard unlawfully discriminatory.

Nor does the record support the explanation that black Barney employees did not seek promotion and remained at the Barney Yard as a matter of personal preference. The evidence shows that a substantial group of Barney employees accepted promotions at Barney Yard when vacancies occurred. More significantly, the record fails to show that any Barney Yard employee declined a promotion at Barney Yard when an opportunity for promotion arose. Because successful bidding on a job at CT Yard by a Barney Yard employee inevitably meant a loss of seniority, the failure to make such a bid by a Barney Yard employee could hardly be treated as a considered choice. In short, we see no reason to conclude that, if the promotion opportunities open to CT Yard men had been fairly available to Barney Yard men, the latter would have failed to take advantage of them.

Although the two yards are indeed separate and distinct operations, this fact is irrelevant to the back pay issue. At each yard the same general work is performed and both have the same job classifications, employment qualifications, and rates of pay. But because they are racially identifiable and less attractive employment opportunities are presented at the mostly black Barney Yard, there is unlawful discrimination warranting an award of back pay.

Of course we do not decide that each Barney employee is necessarily entitled to an award of back pay. The statistical evidence in the record tended to prove that certain Barney Yard employees fared better

economically than their counterparts at CT Yard, and other Barney Yard employees, worse.

■ We approve the approach to the back pay computation developed in *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1379–80 (5 Cir. 1974); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 259–63 (5 Cir. 1974); and *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437, 443–45 (5 Cir.), cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). These cases hold that to justify an award plaintiffs must prove that there is a class whose members suffered economic loss as a result of discrimination. Such proof would establish a *prima facie* claim to back pay for each member of the class.

■ The objective of an award of back pay is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. at 2372. In the case at bar, therefore, the district court must calculate the economic consequences of hypothetical employment at the CT Yard, compare it with the economic consequences of actual employment at the Barney Yard and, if the economic consequences of hypothetical employment are larger than the economic consequences of actual employment, award the difference to the affected class member. To that end, each employee claiming entitlement to an award must establish his identity as a member of the class and must prove both his income during the years of discriminatory employment and the nature of his job. While much of this proof has already been adduced, plaintiffs should have the right to supplement it on remand, if they wish. The employer then should be afforded the opportunity to present proof that any particular class member is not entitled to back pay, for whatever reason: e. g., lack of qualification, free and voluntary decision to forego higher-paying work opportunities, lack of higher-paying work opportunities, and the like. If the employer establishes his defense by a preponderance of the evidence, then the member's *prima facie* case will be overcome and he should be denied back pay, or have his claim reduced, as the case may be. Otherwise, an award should be made in the amount that the proof establishes.

■ Some additional comments with respect to the award of back pay are required. N & W argues that because its good faith efforts to dovetail seniority rosters in 1968 were frustrated by the unions, any award of back pay should be assessed solely against the unions. The unions, on the other hand, argue vigorously that any back pay award should be solely against N & W and not against them, even in part.

We do not think that N & W can escape liability to plaintiffs for back pay. As we have said, irrespective of any good faith effort on the part of N & W to obviate the discriminatory effect of separate seniority lists in 1968, the fact is that the discrimination was not obviated; under *Albemarle Paper Co.*, N & W's good faith efforts cannot insulate it from plaintiffs' claims. At the same time, 42 U.S.C. § 2000e–5(g) authorizes an award of back pay against an "employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice . . . ." It may well be that the unions should bear part of any back pay award.[2] As between N & W and the unions, *Albe-*

2. This is not an appropriate case in which to decide whether, consistent with *Albemarle Paper Co.*, an employer may recover an *entire* back pay award from the union, and we do not decide the question. In the record before us, N & W must bear at least some responsibility for the failure to merge the seniority rosters. The question of merging the CT and Barney Yard rosters was first raised by the unions in August, 1967, but it was in the context that *if* the CT roster and the Virginian roster (a third seniority roster, not otherwise concerned in this litigation, resulting from a previous railroad merger) were "topped" and "bottomed" at an undetermined future date, consideration should be given to including the Barney Yard roster. At the same time, the unions took the position that the matter of integrating the rosters was an internal matter for the unions and N & W would be contacted when roster merger was desired. While N & W made some subsequent inquiries as to whether the unions were prepared to consider the matter and received negative responses, it was not until October 31,

marle *Paper Co.* would not render a good faith effort by N & W to eliminate discrimination irrelevant to the question of which should bear what share of a back pay award. At the same time, consistent with the purposes of the Act, any judgment should be against N & W and the unions jointly and severally, or against N & W solely, with a right to partial indemnity from the unions so as to insure that there be an economic incentive for an employer to obviate discrimination voluntarily, rather than by court decree, and that an employee entitled to back pay shall be made whole by obtaining a judgment against a financially responsible party.

But, the question of whether the unions should bear part of the award for back pay is not ripe for adjudication. It has not yet been decided by the district court. The district court did not reach the issue since it erroneously concluded not to award back pay. Even if we assume that all of the proof relevant to the equitable considerations of a possible division of a back pay award has been adduced, the fact-finding function and the exercise of discretion are vested in the first instance in the district court. We defer to it for initial decision of this issue. We state only that the decision of whether either or both of the unions is to share in N & W's liability for back pay depends upon whether they combined with N & W to deprive black employees of income opportunities. *Carey v. Greyhound, Inc.,* 500 F.2d 1372, 1379 (5 Cir. 1974); *Guerra v. Manchester Terminal Corp.,* 498 F.2d 641, 655–56 (5 Cir. 1974); *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d at 1381–82.

## II.

Our mandate with respect to seniority in the earlier appeal was that seniority rosters in the two yards be merged. We directed that with respect to the right of Barney Yard brakemen to qualify for promotion to conductors, "any decree should, while protecting Barney Yard brakemen from prejudice in connection with promotion to this higher classification, not give such brakemen any higher or broader rights than those enjoyed or granted to CT Yard brakemen, who had qualified for promotion to conductors." 473 F.2d at 1349.

In formulating a decree, the district court merged the two seniority lists and ranked conductor seniority on the basis of date of promotion to conductor. Only the merger of the lists with respect to conductors is questioned in this appeal. Plaintiffs contend that the merger effected by the district court preserves discrimination heretofore practiced with respect to two classes of conductors or potential conductors, i. e., Barney Yard brakemen hired before March 18, 1956, who have been promoted to conductor, and Barney Yard brakemen hired between March 18, 1956 and September 18, 1963 (the date by which every CT Yard brakeman had had an opportunity to be promoted to conductor), who have never had an opportunity to qualify as a conductor.

Plaintiffs contend that merger of the seniority lists with respect to these two classes of conductors and potential conductors should be on the basis of company seniority (date of hire as brakemen) where competition between Barney Yard conduc-

1968, that N & W wrote to the unions advising that it "propose[d] dovetailing of the seniority rosters" and requested a meeting "to effect this as soon as possible." Two meetings were held in November, 1968; and when the unions expressed opposition to dovetailing, N & W proposed that the rosters be merged by "topping" and "bottoming," effective December 1, 1968. N & W's proposal was not responded to by June 2, 1969, when the present suit was instituted. From all that appears, N & W, after abandoning dovetailing after two discussions and proposing "topping" and "bottoming," did

nothing to further its amended proposal from November, 1968, to June 2, 1969. Its role appears to have been passive acceptance of the union's claim that resolution of the matter was solely a question of unions' internal management. If an employer may ever recover an entire back pay award from the union on the theory that the union frustrated the employer's good faith efforts to bring about compliance with Title VII, the employer must demonstrate a more assiduous effort on its part to eliminate discrimination than has been shown here.

tors (both present and future) and CT Yard conductors is concerned, but that date of qualification as conductor should determine relative seniority among Barney Yard conductors (both present and future), on the one hand, and CT Yard conductors, on the other hand.[3] N & W is neutral in the dispute and specifically disclaims any valid business reason to prefer plaintiffs' plan of merger over the merger effected by the district court and supported by the unions, or vice versa. We think that for the two affected classes, plaintiffs' merger of the seniority rosters should be decreed, subject of course to actual qualification as conductors by those Barney Yard brakemen hired between March 18, 1956 and September 18, 1963, who have never had the opportunity to qualify for conductor.

To understand our conclusion, additional facts should first be stated. In both yards, when N & W determines the need for additional conductors, brakemen have the opportunity to qualify in the order of their brakemen seniority. Since the need for conductors in the particular yard fluctuates, the length of time brakemen must be employed as brakemen before having the opportunity to bid for promotion also varies.

The record reflects that CT Yard brakemen gained the chance to promote to conductors far more rapidly than Barney Yard brakemen. By April, 1971, every CT Yard brakeman hired on or before September 18, 1963, had been offered the opportunity to be promoted to conductor. Most CT Yard brakemen hired before 1964 were promoted to conductor after 6–7 years as brakemen— three within three years. No Barney Yard brakeman hired after March 18, 1956, had, by April 1971, any opportunity to become a conductor. Most Barney Yard brakemen who had received a chance to be promoted waited a period of 8–15 years after first employment as a brakeman to receive an opportunity to bid for promotion.

Because Barney Yard brakemen have enjoyed fewer and slower opportunities for promotion to conductor, all Barney Yard brakemen hired between March 18, 1956, and September 18, 1963, who have never had the opportunity to qualify as conductors, as have CT Yard brakemen hired in this period, and those Barney Yard brakemen hired before March 18, 1956, who have been promoted to conductor, carry a later seniority date than similarly situated CT Yard conductors.

Given the discrimination in employment between the two yards as found by the district court and affirmed in the first appeal, reinforced by the additional facts that we have recited, we think that the district court's merger of the seniority rosters with respect to conductors of the affected classes (both present and future) will preserve and perpetuate past discrimination. Present Barney Yard conductors of the affected class will forever suffer a loss of seniority compared to their CT Yard counterparts. Barney Yard brakemen of the affected class who may hereafter qualify as a conductor can never overcome the disadvantage in seniority that that discrimination inflicted. The case strongly resembles *United States v. Chesapeake & Ohio Railway Co.*, 471 F.2d 582, 588–89 (4 Cir.), cert. denied, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973), where we held that "topping and bottoming" was not an adequate remedy to eliminate the racial discrimination that initially barred brakemen from becoming conductors. In short, the proposed means of merging the conductors' seniority lists fails to effectuate our prior mandate in this case to protect "Barney Yard brakemen from prejudice in connection with promotion to [conductors]." 473 F.2d at 1349.

The plaintiffs propose their own merger plan and the union advocates that adopted by the district court; N & W says either is feasible. Others may be devised, but we do not stop to construct them. They were not presented to the district court and they are not urged on appeal. Because of the com-

---

**3.** Plaintiffs' proposed merger proscribes displacement of incumbents and limits seniority competition to future vacancies.

plexities of the issue, we prefer not to go beyond the alternatives which N & W says are workable.

We think that plaintiffs' proposed merger of seniority rosters would be in accord with our prior mandate. It will redress discriminatory loss of seniority on the part of Barney Yard conductors in one of the affected classes, and it will make possible nondiscriminatory promotion of Barney Yard brakemen in the other affected class—all without giving members of either class any broader or greater rights than those possessed by CT Yard conductors. On remand, the district court will amend its decree in this respect accordingly.

### III.

■ Finally, we turn to the assertion that minimum wage guarantees made to certain N & W employees in 1964 when Nickel Plate Railroad was merged with N & W should be extended to certain of the plaintiffs. As part of the merger agreement N & W and the unions agreed that each yardman employed by N & W as of October 1964 would be guaranteed the same level of average monthly earnings as he enjoyed in the one-year period immediately prior to the merger. The minimum wage guarantee agreement is not applicable to yardmen hired after October 16, 1964. The Interstate Commerce Commission adopted this agreement in approving the merger. Under the agreement each N & W yardman submits a claim for additional compensation showing his "test" wage and his actual earnings for the month pertinent to the claim. If his actual earnings are less than his "test" wage, he must assert his availability for more work had it been available, and overall the computation must show the amount due him, i. e., the difference between guaranteed wage and actual earnings. If the employee failed to accept work that he would otherwise have received, his claim to the minimum wage is forfeited to the extent that he declined to work.

With respect to Barney Yard brakemen whose opportunities for work and for promotion at the Barney Yard were less than those of their counterparts at the CT Yard, we have previously shown that they have suffered discrimination which is reflected in their total compensation. In any month in which there was insufficient work for all yardmen at both yards, Barney Yard men employed prior to October 16, 1964, suffered further discrimination in that their guaranteed monthly wage was less than the guaranteed monthly wage of their counterparts at the CT Yard. It follows, we think, that to redress fully the discriminations which have been practiced against it, this group should be treated as if the minimum wage guarantee had extended to it. This is only a ramification of our general holding that the back pay awards due Barney Yard men should be measured according to what they would have earned had they been employees at the CT Yard prior to October 16, 1964. See *Bowe v. Colgate, Palmolive Co.*, 489 F.2d 896, 903–04 (7 Cir. 1973); *Peters v. Missouri-Pacific Railroad Co.*, 483 F.2d 490, 498–99 (5 Cir.), cert. denied, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 238 (1973); *Rosen v. Public Service Electric & Gas Co.*, 477 F.2d 90, 95–96 (3 Cir. 1973).

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and our decisions in *Chesapeake and Ohio Railroad Co.* and *Robinson* establish that Title VII requires elimination of all continuing effects of past discrimination. Subject only to our later discussion that Barney Yard employees' prosecution of this aspect of their claim to back pay may have prejudiced the parties liable therefor to the extent that recovery should be denied, we think that application of the Nickel Plate Merger Agreement to increase monthly guarantees to Barney Yard employees equivalent to guarantees granted CT Yard employees of comparable seniority falls within the scope of settled law.

The district court declined to consider the claimed extension of the Nickel Plate Merger Agreement on the ground that the claim was untimely, saying "[a]t no time prior in the four-year record of this case before this

Court has there been any mention of guarantees under the Nickel Plate Merger Plan, that is, until February 8, 1974, or final argument of the matter on remand. We deem it inappropriate to move to new material at this late date."

Before us, N & W argues that Barney Yard employees must have known before the first remand of the guarantees made to CT Yard men, but Barney Yard employees did not assert the claim until N & W invoked the Nickel Plate Minimum Compensation Agreement to support its argument that a provision should be included in the dovetailed seniority lists prohibiting N & W from requiring a CT Yard employee to work at the Barney Yard even if there were no work available at the CT Yard. N & W thus urges the correctness of the district court's treatment of the issue.

In *Albemarle Paper Co.,* the district court denied a claim for back pay, *inter alia,* because it was not asserted until five years after the complaint was filed and the employer was thereby "prejudiced." The Court held that "a party may not be 'entitled' to relief if its conduct of the cause has improperly and substantially prejudiced the other party. . . . To deny backpay because a *particular* cause has been prosecuted in an eccentric fashion, prejudicial to the other party, does not offend the broad purposes of Title VII." 422 U.S. at 424, 95 S.Ct. at 2375. In that case the issue was remanded to the district court for a specific determination of "[w]hether the petitioners [employers] were in fact prejudiced, and whether the respondents' [employees'] trial conduct was excusable . . . . 422 U.S. at 424, 95 S.Ct. at 2375. Thus, *Albemarle* recognizes that a claim for back pay may be forfeited if it is inexcusably pressed under such circumstances as prejudice the employer.

Aside from its statement that in the view of the district court plaintiffs were late in asserting any claims arising from the Nickel Plate Minimum Compensation Agreement, the factual bases on which a late back pay claim may properly be denied were not considered. Specifically, the dis-

trict court made no finding of whether lateness, if that be found, was excusable and, if not, whether N & W was prejudiced. As in *Albemarle Paper Co.,* these are questions for the district court in the first instance and should be considered on remand. We will remit them to the district court, cautioning only that *Albemarle Paper Co.* teaches "[i]t is necessary . . . that if a district court does decline to award backpay, it carefully articulate its reasons." 422 U.S. 405 at 421, 95 S.Ct. 2362 at 2373, n.14.

Accordingly, we hold that, unless it be found that the circumstances of assertion of the claim have been prejudicial to N & W such as to warrant barring its allowance, in the computation of back pay for Barney Yard employees the Nickel Plate Merger Agreement be given effect and that employees be entitled to back pay to the extent that they can demonstrate that they failed to earn the minimum wage guarantees afforded their counterparts at the CT Yard.

*VACATED AND REMANDED.*

WIDENER, Circuit Judge (concurring and dissenting):

I

I am in general agreement with the majority as to part II of its opinion that the "date of promotion to conductor" should not govern in the dovetailing of the seniority lists of the Barney and CT yards. But I do not believe the dovetailing should be done on the basis of the "date of hire as brakeman," for so doing is in the face of our previous opinion quoted by the majority which directs the district court not to ". . . give such brakemen any higher or broader rights than those enjoyed or granted to CT Yard brakemen, who had qualified for promotion to conductors." 473 F.2d at 1349.

I would give all the Barney yard brakemen the same opportunity to qualify as conductor as their CT yard counterparts based on the latest date of promotion to brakeman of a CT yard employee who has qualified for conductor. And then, with such qualifications accomplished, I would

require the district court to match the two conductor lists, Barney and CT yards, one against the other, and for all of the conductors then qualified, equitably to dovetail the lists, taking care to give consideration to date of hire as brakemen, as well as date of promotion to conductor, correct any lack of opportunity to qualify as conductor, consider whether or not the employee previously aspired to conductor status, etc., and to create no "higher or broader rights than those enjoyed or granted to CT yard brakemen." It is true that in many or even most cases the date of qualification to brakeman might govern, but it is equally true that employees who did not previously wish to be promoted for one reason or another would not now receive super seniority in a position to which they did not previously aspire. The object of dovetailing is to correct the inequality of opportunity. When that has been accomplished, the court has no further function.

## II

Our previous opinion in this case, 473 F.2d 1344, was handed down February 13, 1973. Throughout the first trial of this case, filed in 1969, and throughout the second trial of the case, after remand, no claim was made by the plaintiffs under the Nickel Plate Merger Plan until January or February 1974 on final argument of the matter. Well after all the evidence had been taken in the case, the court was asked to consider this separate contract. Indeed, it is not even in the record. I think the district judge did not abuse his discretion in declining to consider a contract, not even a part of the record, which was never introduced into evidence and only alluded to

after the completion of two trials and almost five years after the filing of the case. Discretion in such matters must be placed in the hands of trial judges who should be reversed only for abuse of discretion. I do not find a scintilla of evidence from which abuse may be inferred.

## III

### (A)

I had thought and still think that if there should be an award of damages it ought to be broken down in discussion between the period prior to the October 31, 1968 offer to dovetail, later referred to, and the period subsequent to that time. Since the majority opinion, however, apparently is based entirely on the failure of the railroad to dovetail, my dissent will also point largely to that subject.

With reference to the majority finding that an award of back pay is justified because "it is total income, not rate of pay, by which discrimination in compensation is measured," this is only another way of saying that since the average income of Barney yard employees was less than that at the CT yard, an award of back pay is necessarily required. As it has been pointed out to us in dozens, or even hundreds, of instances,[1] Barney yard employees with no more, or even less, seniority earned more in a given period than CT yard employees. These undisputed facts alone should be sufficient to prevent the majority from painting with the broad brush of averages and if there should be an award of damages to limit it to those Barney yard employees who were in fact denied advancement prior to October 31, 1968 because of lack of opportu-

1. Only a small example is here copied from the brief of N & W, which is fully supported by the record, but is not considered by the majority:

"In 1966 ten Barney Yardmen earned more *gross pay than CT Yardmen with substantially identical* dates of hire. In 1967 twenty-seven Barney Yardmen earned more gross pay than CT Yardmen with substantially identical dates of hire. In 1968 thirty-one Barney Yardmen earned more gross pay than CT Yardmen with substantially identical dates of hire. In 1969 thirty-four Barney Yardmen earned more gross pay than CT Yardmen with substantially identical dates of hire. In 1970 forty-three Barney Yardmen earned more gross pay than CT Yardmen with substantially identical dates of hire. In 1971 twenty-eight Barney Yardmen earned more gross pay than CT Yardmen with substantially identical dates of hire. In 1972 twenty-three Barney Yardmen earned more gross pay than CT Yardmen with substantially identical dates of hire. In 1973 twenty-two Barney Yardmen earned more gross pay than CT Yardmen with substantially identical dates of hire."

nity for advancement at the Barney yard, as well as to those who suffered financial disadvantage in fact by virtue of Barney yard employment.[2]

### (B)

I am of opinion the holding of the majority, that an across the board back pay award against the railroad is necessary and required in this case as a matter of law, is not only unsupported by the record in fact, it is contrary to recognized legal principles and is a reading of *Albemarle Paper Company* unsupported by that opinion.

A principal error of the majority is its refusal to apply the clearly erroneous rule of FRCP 52(a) to this case, although such is the express command of *Albemarle Paper Company*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375. As the court there notes, "[o]n these issues of procedural regularity and prejudice, the 'broad aims of Title VII' provide no ready solution." Thus, the Supreme Court, in its very latest opinion in a Title VII case, accords no procedural preference to Title VII actions, and includes specifically "whether the District Court was 'clearly erroneous' in its factual findings." 422 U.S. 405, 424, 95 S.Ct. 2362, 2375.

The finding of fact of the district court that the railroad offered, on October 31, 1968, to dovetail the Barney yard and CT yard rosters is amply supported by the record, and any suggestion by the majority that it did not is simply contrary to all the evidence. The holding by the majority that the record does not support the district court's suggestion that the plaintiffs knew of the merger offer in 1968 is also, I submit, contrary to the record and to the clearly erroneous standard of review prescribed by *Albemarle*. I also find unjustified the absence of reference in the majority opinion to the unassailed finding of fact by the district court that "The [October 31, 1968 dovetailing] proposition was turned down by the Unions."

The railroad, on October 31, 1968, wrote the following letter to M. Y. Lusk:

"Dear Mr. Lusk:

Please refer to your letter of August 30, 1967, File No. 13/16–58, and conferences October 2 and 19, 1967, January 4 and 22, and February 1 and 16, 1968, concerning Barney Yardmen, Norfolk Terminal.

We propose dovetailing of the seniority rosters of Barney Yardmen and Norfolk Terminal Yardmen and would appreciate it if you would arrange to meet with us at your earliest convenience to effect this as soon as possible.

Please advise.

Very truly yours,

(s) E. A. Manetta

Vice President-Personnel"

Lusk was the General Chairman of the union for the Norfolk and Western employees involved in this case, including all of the Barney yard employees, and it must be remembered that the focus of the entire case as we now have it is on the merger of the mostly black local No. 974 with the mostly white local No. 550.[3] Lusk negotiated for the Barney yard and CT yard employees with respect to the merger of the two locals from time to time over a period of months from at least 1967 until after this case was filed. Not only did Lusk receive the letter, it was brought to the attention of F. A. Hardin, an International Vice-President of the union who had been brought into the negotiations. The district court

---

2. I have not attempted to voice my disagreement with each point of the majority opinion with which I am not satisfied, but one other should briefly be mentioned here. It seems that shifting the burden of proof to a defendant and compelling a finding by establishing a prima facie case is contrary to *Wright v. Rockefeller*, 376 U.S. 52, 57, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

3. I express no opinion on whether or not the unions are in fact liable to the plaintiffs. But, since the railroad in fact made a bona fide offer to do, in 1968, the same thing we now command it to do in 1975, it is nothing less than injustice to mulch it for damages based on any lack of knowledge of the 1968 offer on the part of the class plaintiffs. Such lack of knowledge, if any, is bound to be based on their own international and local officials not imparting knowledge of the offer to them.

found as a fact that this was a bona fide offer, and the majority opinion points to no evidence to the contrary.

Robert Rock, one of the named plaintiffs, was local chairman of Local No. 974 throughout, and attended the numerous meetings concerning the merger of the rosters which took place during 1967 and 1968. Even discarding the balance of the voluminous evidence from which the district court could draw inferences, Lusk testified, in response to a question as to whether he had told the officials of Local 974 that he had the letter: "I think the letter, while not officially presented, was known." Among other meetings Rock attended attempting to negotiate terms of merger was one in November 1968, just following the receipt of the letter by Lusk. The record also shows various communications from one Peanort, secretary-treasurer of Local 974, during times pertinent to the question here. Peanort also attended various conferences with respect to the very question, as did one Haynes, the president of Local 974. The fact is that the question of dovetailing was never seriously considered by the unions involved because it would have necessarily resulted in displacement of seniority, although topping and bottoming, a system under which each yard's employees would go at the bottom of the other yard's seniority list, thus getting ahead of all new employees in both yards, while preserving seniority in their own, received much discussion and letter writing between the officers of Local 974, including Rock, and the railroad.

So the crediting by the majority of testimony of representatives of the affected class that they had neither seen nor heard of the offer and its casting aside the perfectly well supported findings of fact by the district judge is quite beyond comprehen-sion. Especially in view of the fact that a copy of the October 31, 1968 proposal of dovetailing was filed with a motion to dismiss on July 21, 1969, and necessarily known to the plaintiffs' attorneys in this case and also to the plaintiffs, the testimony of Rock, Peanort and Haynes that they had not seen the letter until 1971 and the testimony of Rock and Haynes that they had not heard of it seems not only suspicious but may approach the inherently incredible. The finding of the district judge that he doubted the testimony and found it "hard" "to believe" was obviously a euphemism.[4]

The finding of fact by the district judge that the proposition contained in the October 31st letter "was turned down by the Unions" is fully and amply supported by the testimony of at least Lusk and Hardin, which the district judge had a right to credit. And his following findings of fact and law that "[i]n 1968, they, as rank and file members, simply did not want to voluntarily chance a loss of seniority by any dovetailing of rosters, and they ought not to be allowed back pay now for something they opposed then," is equally supported by the record and common justice.

The majority's crediting witnesses not credited by the district judge; finding facts not found by the district judge; and discarding facts found by the district judge; especially when the district judge saw the witnesses and heard them testify, is to me a flagrant disregard of FRCP 52(a), not to mention the recent express command of the Supreme Court in *Albemarle Paper Company.*[5]

Believing as I do that the findings of the district court are amply supported by the record makes all the more remarkable to me the holding of the majority that the railroad may not not "escape" from any

---

4. Since I believe correct the finding of fact that the class plaintiffs had actual knowledge of the 1968 offer, I need not reach the valid legal proposition that they are nevertheless bound by the knowledge of their representatives in a contest with the railroad. In a contest with the union, of course, they would not necessarily be bound.

5. Assuming the union official mentioned on p. 340 of the opinion was Hardin, I note in passing his testimony was that he did not tell the "members of 974" he "had knowledge of such a letter." But the majority here, in all events, is not allowed to select such evidence as it believes and credit it; that is a function of the district court.

back pay award, and that "any judgment should be against N & W and the unions jointly and severally, or against N & W solely." This holding is pegged on two propositions. The first is that mere good faith efforts by an employer to bring about compliance are not enough to escape liability; and the second is that the judgment must be against "a financially responsible party."

The proposition that good faith efforts of the railroad to bring about compliance are not enough is explained in footnote 1(a) in which it is stated that "[t]he employer must demonstrate a more assiduous effort" than has been presented here in order to escape liability for back pay. Referring back to the letter of October 31, 1968, we see that it is unconditional and undenied, and that it was rejected by Local 974, one of the plaintiffs in this case and the representative of the individual and class plaintiffs. How an employer can make a more "assiduous effort" than to make an unconditional offer is something I find difficult to understand. And neither the majority opinion, nor briefs, nor argument have suggested anything the railroad could have done other than to make an unconditional offer.

In this connection, it is well to remember, as mentioned by Judge Field in his dissent in the allied case of *Williams, et al v. Norfolk & Western Railway,* 4 Cir., 530 F.2d 539, that the railroad is governed by the provisions of the Railway Labor Act, 45 U.S.C. § 152 Seventh and § 152 Tenth, which not only provide that no carrier shall change the working conditions of its employees other than in a manner prescribed by the statute, but also provides criminal penalties for any violation. So the suggestion of the majority that the railroad should have taken unilateral action, I think, cannot be supported as a matter of law. Along the same line, our opinion in *Moody v. Albemarle Paper Company,* 474 F.2d 134 (4th Cir. 1973), that back pay should ordinarily be awarded unless special circumstances should render such an award unjust, takes into account in note 5 cases involving employers complying with a rule of state law.

Why an employer may be exempted from liability under some circumstances by complying with a state law and condemned to liability for complying with a federal law is an inconsistency I do not think acceptable, and no reason exists to fashion such a distinction.

Finally, I protest the reasoning of the majority that an award should be made against any party in any lawsuit because it is financially solvent. This is a kind of Robin Hood justice which I do not and may not subscribe to.