564 F.2d 1073
 16 Fair Empl.Prac.Cas. 44, 15 Empl. Prac.
Dec. P 7843
Willie WHITE, John Lowery, Jake Taylor, Blair Huntley,
Stephen Shipman, and Charlie Hudson, Appellees,
v.
CAROLINA PAPERBOARD CORPORATION, Appellant.
 No. 75-2266.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 8, 1976.
Decided Sept. 23, 1977.
 
 John O. Pollard, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for appellant.
 J. LeVonne Chambers, Charlotte, N. C. (Louis L. Lesesne, Jr., Chambers, Stein, Ferguson & Becton, Charlotte, N. C., Jack Greenberg and Barry Goldstein, New York City, on brief), for appellees.
 Before BRYAN, Senior Circuit Judge, MARKEY, Chief Judge,* and WIDENER, Circuit Judge.
 WIDENER, Circuit Judge:
 
 
 1
 Having complied with the procedural requirements of Title VII,[1] Willie White, John Lowery, Jake Taylor, Blair Huntley, Stephen Shipman, and Charlie Hudson, black employees at Carolina Paper Board Corporation (the company), brought this class action[2] against the company for discriminatory hiring, job assigning, and promoting practices contrary to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981. The district court found the company perpetrated presently its past discriminatory practices against black employees by "assigning . . . (them) to limited job positions and permitting transfers or promotions to the traditionally white jobs only from job positions black employees have not been allowed to fill. . . ."
 
 
 2
 The company is a North Carolina corporation which manufactures paperboard from waste paper. At the time of trial, it employed 83 employees, 24 of whom were black. The district court found that prior to 1971 all of the company's black employees were assigned to the beaterroom, receiving, shipping, carpentry, and yard crew; there were no white employees in these departments; and whites filled the better paying jobs of finishers, tenders, converters, screenmen, oiler-boilermen, truck drivers, maintenancemen, electricians, foremen and supervisors.
 
 
 3
 Following or during an investigation by the EEOC in 1971, the company offered to each black employee a job as finisher, which job position, as will be later seen, is the key to much promotion within the company. The named plaintiffs and class members refused, for various reasons, some because they were then too old to perform the strenuous physical labor which the job requires. The company additionally employed two black finishers in 1973 and three white beatermen in 1974. Also in 1974, it promoted to tender a black employee, who later requested and was reassigned to a finisher's position. Nevertheless, at the time of trial, many departments were nearly as racially-identifiable as before 1971.
 
 
 4
 To remedy the present effects of past discrimination, the court, among other things, ordered the company, in production and maintenance, to post all vacancies, to list employee seniority, and to submit to the court objective standards for job qualifications.[3] The company does not challenge these rulings on appeal.
 
 
 5
 The order further required the company to offer each plaintiff and class member an opportunity to transfer to any production or maintenance job upon any vacancy on the basis of companywide seniority, and to permit the employee to return to his former job for a period of 90 days if he should prove unable to perform the new job; to "red circle" the salary or wages of any employee who transferred under this order to a job paying less than his former position until he could promote to a job with the same or higher pay than his former position. We affirm these provisions of the order, for reasons made apparent in our opinion.[4]
 
 
 6
 Other parts of the order required the company to promote or hire one black in supervisory and foreman positions for every other employee hired or offered such position until black employees hold 25 percent of such positions; to reclassify job positions held by black working foremen to include all responsibilities previously required of whites in such positions, as well as privileges. We reverse these provisions with one exception.
 
 
 7
 The district court awarded back pay at an "average annual rate of $2,443.35 which represents the difference in average earnings between black and white employees (except some salaried positions) for the applicable period plus six percent per annum" and "front pay" of one-half that sum ($1,221.67 per year) "for a period of three years as anticipated loss of earnings until the employee can be placed in his rightful position." We modify the award of back pay as described below.
 
 
 8
 The company's paperboard manufacturing process starts when beatermen dump waste paper into pulper tanks, where a rotor device grinds the waste paper, mixes it with water, and turns it into a slurry of 95 percent water and 5 percent waste paper. The slurry then passes through a stainless steel pipe into large storage tanks. From there the slurry is pumped through Jordan Head Boxes, where the head beaterman, following the instructions of his foreman, routes his stock into particular Jordans according to the grade of paper he is making. As the paper stock runs through the Jordans, protruding bars chop the stock into finer, smaller and more refined particles. From there, the machine tender, at the controls of the machine head box, routes the stock into one of four separate systems, and regulates the flow of the paper stock into it. In each of these systems the stock flows through fan pumps, where more water is added, and then flows into one of seven vats. The vats are the first phase of the paper machine, a machine 98 feet long.
 
 
 9
 A machine tender regulates the flow of the stock through rotating screens in the vats which suck out any unwanted debris from the slurry. Cylinders at the top of each vat dip into and catch up some of the paper stock. A continuous running felt passing over the seven cylinders picks up paper stock and carries it through the succeeding sections of the paper machine. As the felt passes over each cylinder, a new layer of paper stock adheres to it, so that after passing the seven vats, the paper product is a seven ply sheet. See Fig. 1.
 
 
 10
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 11
 At this point the stock is ten percent paper and 90 percent water. The process of extracting the water and drying the product then begins. The felt runs over two extractors which remove some of the water. A second felt meets the product from underneath and helps carry it to two presses. Here rollers apply pressure to the stock between the felts, while vacuum suction devices suck up excess water.
 
 
 12
 The front edge of the paper sheet does not feed automatically into the second press, but falls into the pit below. The foreman must catch the edge as it comes through the first press and throw it up into the nip of the second press. Once so threaded the sheet will move continuously into the second press until it tears or breaks. When it breaks, the foreman must tear completely across the sheet and re-feed it into the second press. See Fig. 2.
 
 
 13
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 14
 When the sheet comes out of the second press, the foreman and finishers thread it through each of the 64 dryers. The back tender (with foreman or finishers) then threads the paper sheet into each of the seven calender stacks. All of this threading is a task requiring skill because the paper sheet,100 inches wide, is continuously moving as it comes out of the preceding section of the paper machine. Ideally, the task is only performed at the startup of a production run. On an average, however, the paper sheet will break or tear seven or eight times during the day and will then require additional threading. As the sheet leaves the calender stacks, it is threaded into the slitter and cutter, the final section of the paper machine. The back tender sets the cutter's continuously revolving knives to cut the sheet into proper sizes. See Fig. 3.
 
 
 15
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 16
 After passing through the slitter and cutter, the product is dumped into large troughs called "boxes." Finishers reach in, pull out the finished product, and stack it on the skids for shipping. While doing this, the finishers inspect the paper for the innumerable flaws, such as wet spots or holes. If there are flaws, the finishers notify the back tender, who decides whether to save it or stack it for reuse.
 
 
 17
 Two shipping helpers load the product on trucks for shipping to customers. The shipping foreman handles all paper work, making sure customers have the proper orders. He posts delivery assignments for the truck drivers and sees to it that the trucks are properly loaded.
 
 
 18
 The heart of the plant is the paper machine. The function of the other departments is to support production on the machine by keeping the machine in good working order, by shipping the finished product, by receiving the raw waste paper, etc.
 
 
 19
 The company has always awarded promotions on the paper machine according to the following line of progression:
 
 New Finisher Entry Level
 Class C Finisher
 Class B Finisher
 Class A Finisher
 Head Finisher (Assistant Tender)
 Back Tender
 Machine Tender
 Foreman
 Supervisor
 
 20
 No particular skill or experience is required at the entry level of new finisher, but the experience and learning at each stage of the progression is cumulative, preparing the employee for the next stage. Because no black employee had been assigned to the entry level job of new finisher before 1971, they were deprived an opportunity to be promoted to the higher paying jobs in the progression line above set forth.
 
 
 21
 The district court struck down the line of progression on the machine for the sole reason that the employees trained for their respective positions on-the-job. We think the reason is insufficient, and keeping in mind that a district court should be affirmed if right although for a different reason, see SEC v. Chenery, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we nevertheless are of opinion that the vast preponderance of the evidence sustains the line of progression as a business necessity. Facts almost wholly uncontradicted with respect to the process and duties of the employees who work on the machine found throughout the opinion make it apparent that the line of progression is called for. A finding to the contrary is clearly erroneous. F.R.C.P. 52(a). While we affirm those parts of the district court's order which require nondiscriminatory hiring of finishers as being sustained by the evidence, we do not agree with it that the line of progression should be struck down.
 
 
 22
 Practices, procedures or tests, neutral on their face, are unlawful under Title VII if they operate to freeze the status quo of prior discriminatory employment practices. Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970). But if the employment practice which may exclude black employees is job related, the practice is not discriminatory and not prohibited. The touchstone is business necessity. 401 U.S. at 430-31, 91 S.Ct. 849. The skills required at each level of the progression (except new finisher) are learned through the experience of working at the lower level; they are necessary, are business related, and are not discriminatory.
 
 
 23
 The finisher's job is admittedly the most physically strenuous in the plant; their average age is 28. Among a finisher's duties is to lift an average of six tons of paper product per day to the scales for weighing and then to the skids for packaging and shipping.[5]
 
 
 24
 A new finisher's job is for a thirty-day probationary period. He then automatically progresses to Class C finisher where he must acquire two skills before becoming a Class B Finisher. He must learn to tear a tail in the pit and to cut a tail at the calender stacks.[6] As a B Finisher, the worker learns to thread the calender stacks and the cutter, to read a rule, and to make out tickets for customers. When promoted to head finisher, the worker trains to become a tender. He learns to recognize the various qualities of paper and to manufacture certain grades by regulating the machine. He learns to correct flaws in the product, to determine when the paper is not fit to send to customers, and to thread the dryers.
 
 
 25
 The head finisher is a working lead man of the finishers who sees to it that the sheet is properly threaded, slit, cut, weighed, tied or stacked out, skidded, tagged, and placed in the warehouse. He rotates these duties fairly among the finishers.
 
 
 26
 There are two tenders on each shift, one at the wet end, the machine tender and one at the dry end of the machine, the back tender. These two are in constant communication by telephone. As the back tender notices flaws in the paper product, he tells the machine tender so that he may correct it. Each tender is responsible for the quality control of the product at his end of the machine.
 
 
 27
 The back (dry end) tender supervises one assistant and three finishers, notifies the wet end tender of any paper flaws, keeps accurate records of production runs, changes score cut slitters when dull, and decides when the paper is too flawed to be sent to customers. He checks the weight, caliper, and size to customer specification, and threads the stacks.
 
 
 28
 The machine (wet end) tender regulates the machine head box to determine how much and what type of stock goes into each of the seven cylinders. Too much stock produces a condition called "crushing" and will shut down the entire machine. That tender regulates the speed of the machine and the proportion of paper to water in the vats to achieve the desired grade of paper. He also constantly checks the machine's wet end functions.[7]
 
 
 29
 We think the line of progression is also justified up through the jobs of foremen and supervisors and we so hold. An examination of their duties shows the need for supervisory personnel with experience on the machine. By starting from the bottom and working up, they are intimately familiar with the jobs, duties, and problems of each phase of the machine. Such familiarity, we think, is crucial to carry out capably their responsibilities: to get quality and quantity at the lowest possible cost, to ensure the health, safety, and physical condition of the employees, to develop morale of employees, to train and develop employees, to enforce organizational rules, to cooperate with superiors, fellow supervisors, and his own employees. Since the paper machine is the heart of the plant, we think the company justified in selecting foremen and supervisors from the line of progression who are intimately familiar with the process, the duties at each level, and the dangers of the machine. We are of opinion the line of progression of the paper machine not only fosters safety and efficiency, it is essential to that goal. Rock v. Norfolk & Western Ry., Co., 473 F.2d 1344, 1349 (4th Cir. 1973).
 
 
 30
 Plaintiffs filed a group charge of discrimination with the EEOC on June 30, 1969. Under the applicable two-year statute of limitations for damages, the period of discrimination we consider here began on June 30, 1967. Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir. 1976).
 
 
 31
 At trial, the district court found that the company's departments were "nearly as segregated or racially identifiable as before 1971." The record showed the following breakdown of black and white employees in those departments which the appellees argue were traditionally reserved for whites:
 
 
 32
 Classification Black White Total
--------------- ----- ----- -----
Maintenance 0 5 5
Tenders 1 5 6
Converters 0 6 6
Screenmen 0 3 3
Oiler-Boiler 0 3 3
Truck Drivers 0 6 6
Foremen 0 3 3
Superintendents 0 3 3
 
 
 33
 Similarly, the following is the breakdown for the departments traditionally maintained as all black:
 
 
 34
 Classification Blacks Whites Total
-------------- ------ ------ -----
Beatermen 11 1 12
Carpenters 4 0 4
Shipping 2 1 3
Receiving 2 0 2
Yardmen 1 0 1
 
 
 35
 The remaining two departments are as follows:
 
 
 36
 Finisher 4 13 17 *
Electricians 0 2 2
 
 
 37
 * There is less statistical imbalance in this department.
 
 
 38
 The case came on for trial on February 24, 1975. The court heard testimony of one witness for each side and considered that testimony, together with defendant's depositions of each named plaintiff and class member. The court informed counsel of its decision that "the plaintiffs are entitled to the relief sought" and scheduled a "final hearing on the relief to be awarded." But when the company appeared with its witnesses (also appearing were the plaintiffs and 13 alleged class members) and documentary evidence prepared to litigate the relief to be awarded and the amount of damages, the court did not hear any evidence and, instead, read plaintiffs' proposed Findings of Fact, Conclusions of Law, and Judgment, which it had requested, item by item, and requested counsel for the defendant to comment on each. It ordered minor changes, adjourned the hearing, and adopted in large part plaintiffs' suggestions. The above is largely from the unrefuted statement in the company's brief. No record was made of the hearing at which no court reporter was present.
 
 
 39
 We are of opinion that the record was not complete enough at that time for the court to fashion parts of the relief it ordered for plaintiffs and class members based on their actual injuries. Although the court stated the company did not maintain adequate records from which to reconstruct the employment histories of the plaintiffs and class members, those persons as well as others were present in court and ready to testify. If the court had heard their testimony, it is at least likely that it could have fashioned appropriate relief under this circuit's decision in UTU Local 974 v. Norfolk & Western Ry. Co., 532 F.2d 336 (4th Cir. 1975). The only opinion of the district court, which is the plaintiffs' suggested findings of fact and conclusions of law, is bleak indeed in the statement of any facts and is phrased almost wholly in conclusory terms accompanied by citations of authority.
 
 
 40
 Because the record is so incomplete, we are unable to fashion and direct exact relief, even if appropriate for us so to do, and, instead, fashion formulae for computing relief. Therefore, the examples we give here are not to be taken as unbending but as indicating which facts need to be ascertained on remand. The district court will take further evidence and compute the amounts of damages in accordance with the principles expressed in this opinion. We also point out additional factual inquiries to be made in a few other instances. On remand, we suggest the district court prepare its own opinion. Chicopee Mfg. Corp. v. Kendall Co., 288 F.2d 719 (4th Cir. 1961; see United States v. Crescent Amusement Co., 323 U.S. 173, 184, 65 S.Ct. 254, 89 L.Ed. 160 (1944); United States v. El Paso Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).
 
 
 41
 The court below reached its conclusions on back pay considering some black employees and some white employees, with little regard for job function, classification, or length of service, and attributed the difference to racial discrimination. Although we agree that the facts support a finding in some instances of discriminatory hiring and promoting practices, we do not think it is as all-pervasive as the district court found. The statistical evidence indicates that certain of the company's departments were all or nearly all white. Although this may be enough to establish a prima facie case of discrimination, see International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), it is conclusive only when the company fails to show some business necessity justifying its practices. See United States v. Chesapeake and Ohio Ry. Co., 471 F.2d 582, 588-589 (4th Cir. 1972). The Civil Rights Act does not require the company to hire employees who are not qualified for the position merely because of their race. Indeed, the purpose of the Act is "to promote hiring on the basis of job qualifications, rather than on the basis of race or color." Griggs v. Duke Power Co., 401 U.S. 424, 434, 91 S.Ct. 849, 855, 28 L.Ed.2d 158 (1970) (quoting the legislative history, 110 Cong.Rec. 7247).
 
 
 42
 We think the district court's remedial order is too broad. The essence of the company's delinquency was its failure to hire black employees into the entry level finisher's job.[8] The black employees who were qualified, but could not have had a job on the paper machine because of their race, have been injured. The company's offer of a finisher's job in 1971 for many of them could not fully remedy the effects of past discrimination as to them because they no longer possessed a qualification for the job, namely physical stamina. But, for example, a black employee initially hired as a finisher or one already too old to work as a finisher when hired has not been injured by discrimination and should not participate in a back pay award.
 
 
 43
 Likewise, we find error in the district court's conclusion of discriminatory hiring and promoting electricians, truck drivers, and maintenance men. Each of these jobs required certain qualifications. The company hired truck drivers with seven, and usually more, years of over-the-road experience. Its maintenance men, except one auto mechanic, were qualified millwrights. Its electricians were experienced and certified, their jobs requiring particular skill to handle heavy industrial voltage in an environment inundated with water from the manufacturing process. All of these jobs were highly skilled. Nothing in the record points to any black employee qualified for these positions. Also, the record does not show even a qualified black applicant for any of them.
 
 
 44
 Since the record does not support a finding of discriminatory hiring or promoting in these three departments, it was error to include them in computing back pay awards.
 
 
 45
 In order to determine the effects of discriminatory hiring and promoting on the machine, it is necessary to construct a hypothetical employee as he advances to each job in the line of progression. Even though the company may not have complete records, the district court may supplement them by taking testimony of persons now working on the machine or former employees. Unless it is demonstrated to the contrary, we think the average progression in the line of progression can thus be reconstructed within reasonable tolerance. See Teamsters, supra, 931 U.S. at 370, 97 S.Ct. 1843. The court should reconstruct the affected black employee's hypothetical employment history, compare it with his actual employment position, and award him the difference. UTU Local 974 v. Norfolk & Western Ry. Co., 532 F.2d 336 (4th Cir. 1975).
 
 
 46
 For example, the evidence might show the following timetable for progression on the machine:
 
 New Finisher Entry Level
 Class C Finisher after 30 days
 Class B Finisher after 6 months
 Class A Finisher after 1 year
 Head Finisher after 1 1/2 years
 Back Tender after 3 years
 Foreman after 10 years
 Supervisor after 20 years
 
 47
 Following our supposition just given, if an employee had been with the company for three years in 1968 when the position of back tender was vacant, he might be eligible for it. Therefore, the difference in pay from that position would be calculated as follows:
 
 
 48
 Hourly wage of back tender Hourly wage of
who filled the job in 1968 (-) claimant employee Number of hrs.
---------------------------------------------------- x employee actually
 Number of plaintiffs and class worked in 1968
 members who would have been (both regular
 with the company long enough and overtime)
 to qualify for the position
 
 
 49
 This computation, here as an example for the year 1968, should be made for each of the years after the vacancy occurred that it was filled by the same back tender hired in 1968. The total back pay for this job for this employee would be the sum of the difference in pay of each of the years so computed.
 
 
 50
 The plaintiffs and class members who may be entitled to back pay for loss of opportunity to work on the machine, as explained below, are as follows:
 
 
 51
 Employee Date Hired
-------- ----------
Jake Taylor 1958
Stephen Shipman 1963
Willie White 1950
George Outing, Sr. 1969
James Quals 1952
George Bolton 1958
Frank Boyce 1953
Excell Cherry 1945
James Prioleau 1951
Charlie Simmons 1945
James Sloan 1947
Pedro Truesdale 1943
 
 
 52
 The following shows vacancies that occurred between 1967 and 1975 and the black employees who might qualify for each based on our estimated time of progression of the hypothetical employee:[9]The NAMED PLAINTIFFS
 
 Willie White Part A
 
 53
 Willie White, age 63, was hired in December 1949, at age 36, into the beaterroom, where he has remained since that time. The district court found that no one older than 50 could work on the machine from the finisher's through the tender's job. For purposes of explanation throughout this opinion, we assume, without deciding, that this finding is correct, for the company does not assign error on appeal to this finding.
 
 
 54
 Prior to Teamsters, since Willie White was younger than 50 when first employed, it must be assumed that, but for the company's racially discriminatory hiring practices, he would have had an opportunity to start to work as a finisher in 1949. Under the assumed model for the hypothetical employee, he could have been a supervisor by 1970. By 1968 White could have worked on the machine for at least the three years it takes to progress to the tender's job. He could therefore qualify to participate in the back pay award for the 1968 opening. Assuming the tender hired in 1968 remained in the job until 1975, White's back pay for the lost opportunity to work on the machine would be as follows:[10]
 
 
 55
 and so on for the years 1970 through 1975.
 
 
 56
 But since Teamsters' holding that "(t)hose employees who suffered only pre-Act discrimination are entitled to no relief," White would now not be eligible to receive back pay for his loss of opportunity to work on the machine. This is so because he was 50 in 1963, before the effective date of the Act, 431 U.S. at 356, 97 S.Ct. 1865, and well before 1967. See also Hazelwood School District v. United States, --- U.S. ----, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). With respect to working on the machine, since any unlawful discrimination against him occurred after he was 50, he had not been damaged.
 
 Part B
 
 57
 Although White may not recover for the lost opportunity to work on the machine because of his age, his other lost opportunities, however, to transfer as a screen man or a converter would necessarily require computation. As for the machine work, the company should be required to pay for each vacancy which existed and to which the eligible black employees could not aspire because of their race. But if only one vacancy existed, for example, with twelve black employees eligible, it would be equally as unjust to make the company pay twelve times for one injury as not to require it to pay at all. It is with these thoughts in mind that we ascertain the computation of damages White may have suffered for the loss of opportunity to bid on a job as a cutter in the converter room.
 
 
 58
 We assume, however, and this is subject to correction on remand, that White was subject to post-Act discrimination because he could not transfer as a cutter in the converter room which had been reserved for old finishers from the machine. Although White never asked the company for the position, he stated in deposition he would like to be a cutter. We do not think it necessarily determinative that White never asked for the job. No black employees worked in the converter room, and White might have been justified in believing that his request for the position would be denied. See Teamsters, 431 U.S. at 362-69, 97 S.Ct. 1868-71. Title VII does not require that persons engage in futile gestures to gain promotion, Hairston v. McLean Trucking Co., 520 F.2d 226 (4th Cir. 1975). They must, however, sustain the burden described in Teamsters. See especially 431 U.S. at 362-67, 97 S.Ct. 1868-71.
 
 
 59
 The company does not claim any line of progression affecting employees in the converter room. No black employee has ever been a converter, which job was saved for finishers who no longer had the physical stamina to work on the machine but had not been promoted beyond tender. We see no business necessity to justify this practice. Such older finishers could have been transferred, for example, to the beaterroom, carpentry, shipping, or receiving. At least the record shows no reason they could not have been.
 
 
 60
 Specifically, we know that a white employee in the converter room, S. Cione, who was first employed in 1969, was in 1974 a converter. So far as we can ascertain, White's hourly wage was consistently lower than Cione's as shown below:[11]
 
 
 61
 Evidence should be taken on remand to supply the facts surrounding the vacancy Cione filled; when it occurred; how long he held the job; etc. Also the missing figures for 1967-70 should be determined, as should the actual number of hours White worked each year from 1967-75. His back pay computation for 1971, for example, would be as follows:
 
 2.48 Cione's hourly 2.20 White's
 
 62
 wage (-) hourly wage White's actual
 
 
 63
 ------------------------------------------ X hours of work
 
 
 64
 Number of plaintiffs and class = 1971
 
 
 65
 members eligible damages
 
 
 66
 This computation should be repeated for each applicable year from 1967 until the date of judgment and the amounts added. As the record now stands, the discriminatory act occurred which affected White when he could not bid on the job Cione filled.
 
 
 67
 As indicated before, this will cause the company to be required to pay as damages the amount White and his fellow eligible employees were damaged by their loss of opportunity to work in the converter room because of their race. From the state of the record, we cannot ascertain that there was more than the one vacancy between 1967 and 1975. If there were more, damages, of course, should be increased according to a like computation. We do not imply that damages should be awarded for a year prior to that in which the vacancy existed.
 
 
 68
 This method of computing damages requires the company to pay for depriving the eligible black employees of an opportunity to seek each job for which they were qualified, but not for jobs for which they were not eligible and not for vacancies which did not exist during the applicable time period. And front pay in this case, which we later approve, will compensate them for the anticipated time they may need to bid on a job, such opportunity to bid having previously been denied them.
 
 
 69
 We realize there are conflicting equities among the plaintiff class, see Teamsters, 431 U.S. at 370-73, 97 S.Ct. 1872-73, and a just result might be obtained by providing that the most senior of the claimants receive all the compensation rather than having it divided among them. But equality is equity, just as first in time may be first in right. The plaintiffs have chosen to bring this suit as a class action, and there is no indication in the record of any seniority system existing on job biddings at a previous time. Absent some countervailing consideration not brought to our attention, we believe that requiring the company to divide the damages among all those who might have been entitled thereto is preferable to allowing all of the damages to the most senior employee in a company with no seniority system. We express no opinion on a case which was not brought as a class action or in which a seniority system existed.
 
 John Lowery
 
 70
 John Lowery, age 59, was hired in 1966 at the age of 50. At that time, he was already too old to work as a finisher and therefore he was not injured by the company's discriminatory hiring practices on the machine. Lowery was not a class member until 1970, when he was transferred to the carpentry department.
 
 
 71
 In 1970, after Lowery was hired as a boiler helper, the company converted from a coal boiler to a gas or fuel boiler. The new boiler automatically pumped its fuel oil, eliminating the need for boiler helpers who primarily unloaded coal cars, kept the old boiler stokers full of coal and pulled out the ashes. When the company eliminated his job, they transferred Lowery to the carpentry department. Lowery testified that he would work in maintenance as an auto mechanic, keeping the company's trucks and other motorized vehicles in good working order. The only qualification for a mechanic was some prior experience working on automobiles, which Lowery had, and he, therefore, was qualified. But the current auto mechanic has been with the company for 15 1/2 years; there has been no opening in this position since Lowery was hired. Therefore, although he aspired to that position, he has not been injured by even an assumed discriminatory hiring practice for this position, since no auto mechanic, black or white, has been hired while he has been employed with the company.
 
 Jake Taylor
 
 72
 Taylor, age 59, was hired in 1958 at the age of 42. Being 50 in 1966 at the latest, he was not young enough to work on the machine at any time in 1967 or later, so if he had any compensable injury for lost opportunity to work on the machine, it was in 1965-66, a period barred by the limitations of the Act.
 
 
 73
 In deposition, however, Taylor testified he wanted to be a cutter in the converter room. No black employee has ever been a converter. The computation for any loss he may have suffered should follow Willie White, Part B.
 
 Blair Huntley
 
 74
 The record does not show Huntley's age or his payroll records. He had been with the company 28 years when he retired on disability in 1972. Whether he was young enough when hired to work on the machine is a question which will be before the district court on remand. If he was, his back pay computation would follow that of Willie White, Part A.
 
 
 75
 Huntley testified he wanted to be a cutter but never asked for the job because he knew the company was not hiring any blacks in that department. The computation for any loss he may have suffered should follow Willie White, Part B.
 
 
 76
 If there is a discrepancy between the amount of disability which Huntley receives and the amount that he would have received had he been eligible for a job as cutter or on the machine and received it, his disability payments should be increased according to which is the greater.
 
 
 77
 His award of back pay should be the difference between his pay and the cutter's job, or between his pay and a hypothetical employee's on the machine, whichever is greater.
 
 
 78
 Huntley, of course, is not entitled to any back pay, as distinguished from disability pay, after his retirement.
 
 Stephen Shipman
 
 79
 Stephen Shipman, age 40, was hired in 1963 at the age of 28. He was young enough at that time to work on the machine, but Shipman testified that he did not accept a job on the paper machine in 1971 because he has back trouble. Evidence should be taken as to when that back trouble started. If he was unable to work on the machine in any of the years from 1967 to 1971, he should receive no back pay for those years on that account. His disability had nothing to do with his race. Computation for any back pay for any loss of opportunity to work on the machine should follow Willie White, Part A.
 
 
 80
 Shipman also testified that he requested a screenman's job in 1970. A screenman is an employee who, although not technically in the machine's line of progression, has duties bringing him in direct contact with the machine. There are three screenmen per shift. They guide the felts over the paper machine's rollers. If a felt slides too far off the rollers, it will tear up, and the machine will have to be shut down while the felt is replaced. A felt is replaced at substantial expense, about $2,000 for a larger felt and about $1,000 for a smaller one. To correct for felt slippage, the screenman shifts the position of the rollers, by a manual control. But if the felt slides off too far, the screenman must reach between the rollers and pull the felts to the side by hand.
 
 
 81
 No black employees have ever been screenmen. The company has saved this job for finishers too young to retire but too old to continue working on the machine. But the company also offers a business necessity for this practice, although not in the line of progression on the machine. Because of the dangers present near the machine, it says a screenman requires some experience on the machine in order to do this job safely. But a finisher apparently does not specially learn any of the duties of a screenman while working as a finisher. And we cannot tell from the record whether finishers work within close enough proximity to screenmen to observe their performance. It may or may not be that a former finisher would be no better prepared for a screenman's job than a former beaterman unless the company's argument concerning safety is valid. The district court did not address this question and should take evidence on this matter on remand. It can then decide whether the job of screenman should be reserved for former finishers and whether Stephen Shipman would qualify for the position in accordance with that finding.[12] If Shipman is otherwise qualified, a vacancy apparently existing filled by one A. Vaughn in 1972, the computation of back pay should follow Willie White, Part B.
 
 
 82
 Should Shipman be entitled to back pay both for loss of opportunity to work on the machine and to bid on the screenman's job, he should be awarded the greater amount.
 
 Charlie Hudson
 
 83
 Charlie Hudson no longer works for the company. The record does not indicate his date of employment, his age now, or his age when he was first hired. He quit in 1973 because he asked for, but was denied, an auto mechanic's job. But it appears that there has been no vacancy for an auto mechanic in the last fifteen years. If the district court finds no vacancy during the years Hudson was employed, he is not entitled to back pay as a mechanic. The court will also have before it the question of whether Hudson was young enough and physically capable of working as a finisher at any time after the effective date of the Act. If so, he may be able to participate in the pool of employees on the machine from his date of employment until the year he left the company if he otherwise qualifies and any back pay should follow Willie White, Part A.
 
 THE CLASS MEMBERS
 
 84
 We are of opinion that four class members are entitled to no back pay. These are Carlton Davis, Donald Morris, James Outing, and Ervin Miller.
 
 
 85
 Carlton Davis was employed in 1972, after the company offered finisher jobs to black employees. Davis did not take a finisher's job because a finisher's shift rotates from days to afternoons to midnights. Davis preferred to work daylight hours. He is presently a carpenter and testified that he had no interest in any of the other jobs at the company. Morris, Miller and James Outing were each hired after the company began offering blacks the opportunity to work as finishers. They currently work on the machine and testified that they have no interest in transferring to another department, but rather prefer to work up the line of progression on the machine. No claim is made that they have been discriminated against while working on the machine.
 
 Robert McCullough
 
 86
 McCullough was hired in 1969 as a carpenter. At that time he was 29 years old and capable of working on the machine. He is now 34, and still capable of working on the machine. He expresses no interest in that job, however, and prefers to be assigned to the converter room as a cutter. There has been one vacancy in the cutter room since McCullough was hired, and there is one employee there with comparable seniority, S. Cione.
 
 
 87
 1971 1972 1973 1974
 ---- ---- ---- ----
McCullough 2.07 -- 2.30 2.58
Cione 2.48 2.54 2.65 --
 
 
 88
 McCullough's back pay should be computed in accord with the formula in Willie White Part B. The court will need to take evidence to determine McCullough's hourly wage in 1972, and Cione's hourly wage in 1974, figures now missing from the record. If the information cannot be gleaned from testimony, then the court could, for example, take the hourly wages of known years and from those make a finding as to the hourly wages of the unknown years if it deems the evidence of sufficient reliability.
 
 George Outing
 
 89
 George Outing was employed as a beaterman in 1969 when he was 49 years old. At the time of trial, he was 55, too old to transfer to a finisher's job. He testified that he was not now interested in a screenman's or a converter's job and that these jobs were reserved for former finishers. Since Outing was 49 when hired, he could have worked on the machine for one year. This may have been enough time for him to assume a screenman's job even if the district court on remand finds that job in the line of progression of the machine. He could be qualified as a converter, nevertheless, as we have previously held that there is no business necessity justifying the saving of converter jobs for older finishers.
 
 
 90
 Outing was hired on May 12, 1969. The last vacancy in the cutting department was filled on April 28, 1969, approximately two weeks before Outing was hired. It appears that this vacancy was filled before Outing's initial contact with the company. But, on remand, if the date of Outing's application was prior to the filling of the converter vacancy, that might make a difference and the court is not precluded from giving him relief.
 
 
 91
 The court should determine whether Outing was qualified to become a screenman, and if so, if he is otherwise entitled to it, should give Outing back pay for the screenman's or converter's job, whichever is greater. The court will have to take evidence to ascertain the figures now missing from the record, and will also have to consider whether Outing ever desired a finisher's job, as well, and take that into account. If Outing never wanted any of the jobs, of course he is entitled to no back pay. On the other hand, if he did, he may qualify , and the computation should follow Willie White, Parts A and B.
 
 REMAINING CLASS MEMBERS
 
 92
 The twelve remaining class members[13] all testified that at present they were not interested in any other than their current positions. Of these, only one, Tom Murray, was already too old (51 years) to work on the machine when he was hired by the company. Murray would not be entitled to any back pay.
 
 
 93
 Two class members are currently young enough to work on the machine, James Davis, age 47, and Raymond McCorkle, age 43. Both were offered the job in 1971, at ages 43 and 39, but turned it down for reasons not appearing in the record. This may suggest that they also would have had no interest in these jobs when they were first employed. If so, they are entitled to no back pay for denial of opportunity to have been employed on the machine. The burden of proof in all events for employees somewhat similarly situated is discussed in Teamsters, 431 U.S. at 366-71, 97 S.Ct. 1870-73.
 
 
 94
 A similar case is Clarence Eagleston. Although the record does not show his age in 1969 when he was hired as a beaterman, he testified that he refused the finisher's job in 1971, not because he was too old, but because he was satisfied where he was. That being true, he might have had no interest in a finisher's job in 1969 when he was hired. If so, he is entitled to no back pay.
 
 
 95
 Another class member, James Quals, was 49 at the time of trial, and 45 in 1971, when offered a job as a finisher. He refused the job because of a bad nerve in his hand which prevented him from doing heavy labor. Evidence should be taken in the district court to determine when the malady first existed. If it began later than a time at which the company would have likely promoted Quals to a position not entailing such strenuous labor, then his damages can be computed as if the malady never existed. On the other hand, if it existed during all the time Quals worked for the company, then he would never have been qualified to work as a finisher and he cannot complain that he was not offered the job because of his race.
 
 
 96
 The remaining class members may be allowed to share in back pay on the machine according to the formula given for Willie White Part A, if otherwise entitled to it.
 
 
 97
 Under Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir. 1976), back pay in Title VII cases may be supplemented, in the district court's discretion, "by an award equal to the estimated present value of lost earnings that are reasonably likely to occur between the date of judgment and the time when the employee can assume his new position." We see no abuse of discretion in the award of such supplement here. But on remand the amounts should be recalculated in light of this opinion.
 
 
 98
 The district court's order required the company to promote and hire one black employee in supervisory and foremen positions for every other employee hired or offered such position until blacks hold 25 percent of such positions. But we have declined to approve the imposition of quotas where, as here, adequate relief can be obtained without their use. Patterson v. American Tobacco Co., 535 F.2d 257, 274 (4th Cir. 1976); Harper v. Kloster, 486 F.2d 1134, 1136 (4th Cir. 1973).[14]
 
 
 99
 Because we think business necessity supports the company's practice of promoting its general supervisors and foremen from the line of progression on the machine, imposing a quota on these positions yields no benefit to any injured plaintiff or class member. All of these stated in deposition that they refused a finisher's job in 1971 when the company opened the machine to black applicants. The reason each refused is unimportant. The fact remains that, because they cannot, or will not, work as finishers, they will not be qualified foremen and supervisors.
 
 
 100
 The provisions we have made for back pay and the opportunity to transfer to jobs for which they are qualified correct the discriminatory practices and compensate the plaintiffs and class members in accordance with applicable law. A quota here could do no more because none of the victims of discrimination could take advantage of it. Therefore, since the quota offers no relief to injured plaintiffs or class members, we see no "compelling need," Patterson, at 275, to approve it. The Act does not require the application of a remedy to employees who are not subject to discrimination. United States v. Chesapeake and Ohio Ry., 471 F.2d 582, 593 (4th Cir. 1972).
 
 
 101
 We agree with the observation of the Second Circuit which recognized a quota's potentially harmful impact on the work force:
 
 
 102
 ". . . (T)he imposition of a quota will obviously discriminate against those Whites who have embarked upon a . . . career with the expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate rather than diminish racial attitudes. . . . We see no purpose in curing a past mischief by imposing a new one which is deliberately tainted." Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Serv. Comm'n, 482 F.2d 1333, 1341 (1973).
 
 
 103
 Here, not only the white but the black employees working on the machine will suffer a harmful impact by the imposition of a quota. While none of them are currently qualified to assume the jobs of foreman or supervisor, some soon will be. To fill the quota now, the company will have to seek black employees outside its current work force. If it fills 25 percent of its foremen and supervisory positions with outside people, for example, blacks now on the machine will have less chance to fill other openings once the 25 percent quota has been met. We see no reason to disadvantage black or white employees currently on the machine, especially when the quota offers no benefit to those injured by past discrimination.
 
 
 104
 The company has some supervisory positions in its other departments. As far as we can tell on this record, they are: lead carpenter, three head beatermen, shipping supervisor, assistant shipping supervisor, and receiving supervisor. These jobs involve more than purely supervisory duties. Each employee in these positions works along with those employees he supervises. There is no need for imposing a quota for black employees on these positions because all of them, except shipping supervisor, are now filled by blacks. Because there is no compelling need for a quota and because there is no showing that the relief we give here is inadequate, we reverse this provision of the district court's order.
 
 
 105
 Finally, we reverse the following portion of the district court's order as it applies to certain employees:
 
 
 106
 "21. The Company will be enjoined to modify immediately the job positions of the black working foremen in order to eliminate all racial distinctions and discrimination against the black employees in these positions.
 
 
 107
 "Black employees in these positions shall be assigned at least the same duties and responsibilities as the white employees who formerly held these positions and shall be paid on a salary basis rather than an hourly basis in order to eliminate any distinction between the black foremen and the other foremen of the Company."
 
 
 108
 This refers to three supervisory positions formerly filled by whites, now filled by blacks, that is, receiving supervisor, lead carpenter, and assistant shipping supervisor. In the abstract, it may seem routine, but such is not the case here in large part.
 
 
 109
 Before Stephen Shipman took over the job as lead carpenter, his white predecessor computed the number and size of skids or pallets required for customer orders. But Shipman was unable to make the computations, so the company assigned these duties to the office workers. Shipman performs the other duties previously performed by his predecessor.
 
 
 110
 Likewise, before James Davis took over the job of receiving supervisor, his white predecessor moved the company's tractor-trailers around in the yard and up to the loading dock. Davis could not back the tractor-trailers up to the loading dock, so the company required its over-the-road truck drivers to do it. Davis performs the other duties previously performed by his white predecessor.
 
 
 111
 Because neither of these employees could adequately perform the duties of the job, the company reorganized the jobs to accommodate them. To require these jobs, as the district court did, to include duties that the present black supervisors cannot do almost certainly means their dismissal, or at least demotion from their supervisory positions. See Chesapeake and Ohio Ry., supra, p. 593. We simply decline to go so far. We think the company has made a special effort to ensure these black employees their supervisory positions and we will not disturb that reorganization which had nothing to do with race.
 
 
 112
 The company admits in its brief at page 42 that Davis' predecessor was paid on a salaried rather than hourly basis. Nevertheless, we think the company justified in changing his basis of pay, especially since no pay cut resulted. There is no reason to enjoin the company from changing the job's pay when the job's duties have been diminished to accommodate this black employee. We, therefore, reverse the district court's order that Davis be paid on salary and that his job duties be reorganized.
 
 
 113
 Shipman's predecessor was not paid on a salaried basis. We see no discrimination in paying Shipman on the same basis as his white predecessor. We therefore reverse the district court's order that he be paid on a salaried basis and that his duties be reorganized to include those of his white predecessor.
 
 
 114
 In the shipping department, when the company promoted Joe Skipper, a white, from assistant shipping supervisor, to supervisor, Charlie Simmons, a black, took over his old job. As assistant supervisor, Joe Skipper had completed all the necessary paper work in addition to insuring that the trucks were properly loaded. But Charlie Simmons does not do any of the paper work, "because . . . (he) never showed any interest or ability . . ." to perform those duties. We think the record does not support this factually as an adequate business necessity for changing the assistant supervisor's duties. Here, the company does not argue that Simmons is incapable of performing those duties, but simply that he never showed any special interest or ability. We cannot find the district court's ruling as to him clearly erroneous. Therefore, we affirm the requirement that his job duties be reorganized to include those which his white predecessor formerly performed. Simmons' predecessor was paid on a salaried basis. Because there was no reason to change his duties, we also hold that his pay must be on a salaried basis.
 
 
 115
 Accordingly, the judgment of the district court is
 
 
 116
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 *
 United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Sections 706(a), (d), and (e), 42 U.S.C. § 2000e-5(a), (d), and (e)
 
 
 [2]
 The final order defined the class as:
 "(A)ll black persons who applied for employment with or who were employed by the Company on or before November 7, 1973, as beatermen, carpenters, yardmen and in shipping and receiving departments who have been limited, classified, restricted or otherwise discriminated against by the Company in ways which deprive or tend to deprive them of equal employment opportunities and which otherwise affect their status as employees or applicants for employment because of their race or color."
 
 
 [3]
 We express no opinion on the standards previously submitted to the district court
 
 
 [4]
 On oral argument, the plaintiffs concede that the order of the district court should be construed so that the company need not be required to keep a transferee, who takes advantage of the district court's order, in his new job for the whole 90-day period if he obviously would be unable to qualify by the end of the period, and we so construe it
 Additionally, the order of the district court may not be read to include the right to transfer into the line of progression on the machine other than at entry or other finisher, not head finisher or tender, level at which the employee might reasonably and with safety be expected to learn his job within 90 days. In this respect, we note that by the employment of black employees as finishers, the company has reduced significantly the statistical impact of makeup of the department by race.
 The concession, above mentioned as made by plaintiffs at oral argument, will dispose of the company's well founded objection to the district court's refusal to amend its order to include that transferring personnel be qualified for the job to which they might aspire.
 
 
 [5]
 While a finisher's job is the key to much future promotion, it is the least physically desirable in the plant. Not only does the job require skill; it is hot, dangerous, and the most physically demanding
 
 
 [6]
 Although there is apparently no set time limit for learning these skills, the whole progression on the machine appears to be a rather fast process, for the record shows that two employees, George Outing, Jr., and Luther Allen, became tenders after two years on the machine
 
 
 [7]
 Remembering that a foreman, supervisor, or machine tender must have previously mastered his previous jobs including the duties of back tender, the undenied partial quotation below from the "Job Duties of Backtender" serves as a self-explanatory example of the demanding nature of the work on the paper machine:
 "The detail description of the duties of the Backtender is listed below. Duties listed under 'A' shall be those duties which the backtender must personally perform. Duties listed under 'B' shall be those duties which the backtender shall be responsible for the execution by the men under his supervision.
 A. (1) Checking and adjusting draws
 (2) Applying and tending calender coating or water
 (3) Applying proper finish and detecting and removing calender scabs
 (4) Setting slitters
 (5) Checking sheet size and roll widths
 (6) Checking sheet weight and caliper
 (7) Checking general appearance of sheet
 (8) Notifying machine tender of off-weight sheets, foam marks, cuts, checks, light liner and other wet end faults.
 (9) Keeping accurate record of production runs and notifying machine tender in time for weight or grade changes.
 (10) Changing dull score cut slitters.
 (11) Excusing men at proper intervals for a call of necessity or rest breaks
 (12) Notifying finishers when paper is to be saved or held out
 B. (1) Threading paper
 (2) Inspection of paper at boxes
 (3) Correct weighing and tieing or stacking out paper in good order
 (4) Correct tagging of skids or stencilling of bundles or rolls
 (5) Removing shavings and cleaning up broke and trash at all times whenever the other necessary functions of the dry end are properly manned. General housekeeping of the dry end area.
 (6) Holding out off-grade paper."
 
 
 [8]
 We approve the following quotation from the district court's opinion, around which thought our opinion is written: "Had the plaintiffs and their class been afforded the opportunity to move into the finisher jobs when initially hired, they would not now be limited in promotions and job positions so as to perpetuate the past racial policies and practices of the Company."
 
 
 [9]
 We determined these vacancies by examining the dates when employees who now fill the vacancies were hired. We cannot tell, however, whether employees previously holding those positions were also hired during the time period from June 1967 to the date of trial. This question will be before the court on remand. But if a double vacancy in one job occurred during the time span, this will serve only to lengthen the time the company should pay back pay for that job; it is not to be treated as an additional position
 Seniority Necessary Qualified
Year Position to Qualify Employees
---- -------------- ------------------- -------------------
1968 Back Tender 3 Taylor, Shipman,
 White, Quals,
 Bolton, Boyce,
 Cherry, Prioleau,
 Simmons, Sloan,
 Truesdale
1970 Back Tender 3 (same as above)
1971 3 Back Tenders 3 (same as above)
 Foreman 10 Taylor, White,
 Quals, Bolton,
 Boyce, Cherry,
 Prioleau, Simmons,
 Sloan, Truesdale
 2 Supervisors 20 White, Quals,
 Cherry, Prioleau,
 Simmons, Sloan,
 Truesdale
1972 2 Back Tenders 3 Taylor, Shipman,
 White, Outing, Sr.,
 Quals, Bolton,
 Boyce, Cherry,
 Prioleau, Simmons,
 Sloan, Truesdale
 
 
 [10]
 We recognize that UTU Local 974 v. Norfolk & Western Ry. Co., requires the measure of damages to be computed from a figure which includes overtime pay. But we have not used such a figure here because of the different factual situation. It appears that an average work week at this plant is 32 hours. Up until approximately three months before trial, all workers apparently could work as many overtime hours as they wished. This being true, the opportunity to work overtime is not an extra benefit of certain positions, since it accrues to all positions within this company. In all events, no issue has been made of overtime pay by the plaintiffs
 Tender's 1968 White's 1968
hourly wage (-) hourly wage Number of hours White
------------------------------------- X actually worked in
 11 (the number of plaintiffs 1968
 and class members
 qualified for this job)
k Tender's 1969 White's 1969
 hourly wage (-) hourly wage Number of hours White
------------------------------------- X worked in 1969
 11
 
 
 [11]
 It is difficult for us to reconstruct the employment records of the company on this record because there are so many conflicting documents in evidence upon which the district court has not ruled. We have here used the rolls appearing at Joint Appendix, p. 720. This is apparently the most recent and takes into account the reduction of the work force which we assume will be continued indefinitely because there is nothing in the record to indicate otherwise
 1971 1972 1973 1974
 ---- ---- ---- ----
Cione 2.48 2.54 2.65 --
White 2.20 -- 2.51 2.75
 
 
 [12]
 At one time the company offered a screenman's position to a beaterman. The company explains this offer by saying that as the lead beaterman, this employee had some experience around the machine. If the district court determines that experience near the machine is an important qualification for the screenman's job, the extent of exposure to the machine in various jobs would be relevant. The beaterman offered the job as screenman in 1971 was Joe McDaniel, a black employee who refused the offered change of position
 
 
 [13]
 George Bolton, Frank Boyce, Excell Cherry, James Davis, Tom Murray, Raymond McCorkle, James Prioleau, James Quals, Charlie Simmons, James Sloan, Pedro Truesdale, and Clarence Eagleston
 Nine additional class member names appear in the affidavit for supersedeas bond. We have found no other reference to them in the record, in the briefs, or on the company's employee lists. Therefore, we express no opinion as to their status.
 
 
 [14]
 Finding it unnecessary, we express no opinion on the abstract validity of racial quotas. Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936), Mr. Justice Brandeis concurring