**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Appellant**

**and**

**Ruth Stukes, Plaintiff,**

**v.**

**KORN INDUSTRIES, INC., Appellee.**

**No. 80–1606.**

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1981.

Decided Oct. 20, 1981.

Allyson K. Duncan, E. E. O. C., Washington, D. C. (Leroy D. Clark, Gen. Counsel, Philip B. Sklover, Acting Associate Gen. Counsel, Vella M. Fink, Asst. Gen. Counsel, Washington, D. C., on brief) for appellant.

Harry C. Wilson, Sumter, S. C. (Nash, Chappell, Wilson & Booth, Sumter, S. C., on brief), and Karl W. McGhee, Wilmington, N. C. (Stevens, McGhee, Morgan & Lennon, Wilmington, N. C., on brief), for appellee.

Before SPROUSE and ERVIN, Circuit Judges, and RAMSEY, District Judge.*

ERVIN, Circuit Judge:

In this class action arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Equal Employment Opportunity Commission (the Commission) sought compensatory and injunctive relief for alleged racial discrimination by Korn Industries. Although the trial court held in the Commission's favor on the issue of liability, the Commission contends on appeal that the damages awarded were inadequate.

After considering the briefs, record and oral arguments, we affirm the determination of Korn's liability but remand for a recalculation of damages.

I.

A.

*Background*

Korn Industries, Inc. (Korn) is a South Carolina corporation composed of two divisions: the Hardwood Division, which cuts and processes lumber, and the Sumter Cabinet Division, which manufactures bedroom furniture and which is the object of this lawsuit.

Hourly paid production workers at the Sumter Cabinet Division are divided into categories one through nine, in ascending order of pay and skill. Categories one through three include the basic entry level classifications, e. g., janitor and floor sweepers, which require no experience or qualifications other than passing a medical examination. Categories four and five include responsibilities such as sanding curved surfaces, smoothing drawer joints, and spraying lacquer or stain on finished surfaces. Categories six and above involve such duties as applying final coats to completed pieces, maintaining machinery and supplies and generally perfecting and inspecting finished work. Korn labels categories one through three as unskilled, four and five as semiskilled, and six through nine as skilled, but the district court found "confusion and inconsistency" within the categories and that "Korn has no written or even clearly defined policy to determine the entry level job of a new employee."

The district court found that from 1966 to 1975 the number of blacks employed by the Sumter Cabinet Division increased from 167 to 248, and that, during the same time, the number of white employees decreased from 268 to 207. The court also found that most blacks are originally employed in categories one, two and three. As of June 30, 1974, over 97% of the employees originally assigned to category one, over 91% of those assigned to category two, and over 62% of those assigned to category three, were black. No blacks had ever been originally

* The Honorable Norman P. Ramsey, United States District Judge for the District of Maryland, sitting by designation.

assigned to categories six, eight and nine. As of August 30, 1974, 20.1% of the blacks but only 0.7% of the whites hired were originally assigned to category one. Sixty-eight percent of the whites hired were originally assigned to category four or above. As of that date, category one was 100% black; category two, 87% black; category three, 76% black; category four, 58% black; and categories five through nine predominantly white. In 1974, there were 131 employees in categories one through three; 123 employees in four and five; and 131 employees in six through nine.

All of Korn's corporate officers are white, as are its eleven clerical workers and members of its technical staff, i. e., the plant manager, personnel manager, cost accountant and computer staff. In addition, at the time the action was filed and through the close of discovery, Korn employed a supervisory staff of eighteen foremen and assistant foremen (collectively, foremen) all of whom were white.[1] These foremen, who are generally salaried employees, benefit from an incentive bonus plan, in effect since 1970 under which "production bonuses" are awarded based on certain objective factors, that is, the foreman's base pay, the net footage produced in his department and the total man hours utilized in his department per foot of product; minus bonus figures are not charged against the regular pay of the foremen but are charged against future bonus earnings. The foremen have input in the hiring and promotion processes.

Although Korn had no black foremen at times pertinent to this lawsuit, it did have two black employees classified as group leaders, who supervise small groups of employees in the shipping and finishing departments.[2] Group leaders are paid on an hourly basis, spend more than 20% of their time performing manual labor and are not eligible for production bonuses. Further, they have no input into the hiring and promotion processes. No white employee has ever carried the designation of group leader nor had a black group leader during times relevant to this litigation ever supervised a white employee.

Hiring decisions at Korn are made jointly by the personnel manager and the plant manager. When a vacancy occurs, the plant manager notifies the personnel manager, who screens active applications and selects potential candidates. After doing a reference or experience check, the personnel manager interviews candidates and refers those who pass to the plant manager for a second interview. Since 1973, foremen have also participated in the selection process.

With regard to promotion decisions, Korn's policy is to promote from within its ranks; however, employees are not given the opportunity to bid for promotions as notices of openings are not posted but are rather circulated by word of mouth. When an opening occurs, foremen evaluate the employees under their supervision for that position and recommend their selections to the plant manager.[3] The district court found that, during the five years immediately preceding trial, blacks had received two-thirds of the promotions, but that "most" of these had been into categories two, three and four. The court further found that the "vast majority" of white promotions were into categories five through nine.

### B.

### *This action*

This suit had its origin in a May 1971 charge filed with the Commission by Ruth Stukes, a black female, alleging that she

---

1. By the time of trial, one black employee had been promoted to the position of assistant foreman.

2. One of these group leaders was subsequently promoted to assistant foreman, *see* note 1, *supra*, and was replaced by another black man.

3. Every six weeks, the foremen rate each employee as excellent, good, fair or poor in five areas: skill and ability, productivity, attitude, initiative and attendance. These ratings are purely subjective as there are no official guidelines, and as each foreman uses his personal judgment to evaluate even the objectifiable factors of productivity and attendance.

had been denied re-employment by Korn because of her sex. As a result of its investigation of this charge, the Commission brought suit against Korn alleging that the company refused to hire black females because of their race and sex and, further, that the company maintained race and sex segregated job classifications.[4] On the Commission's motion, the issues of liability and relief were bifurcated.

After the first stage of the trial, the court concluded that Korn had violated Title VII by hiring and assigning blacks to lower paying jobs than whites with equal qualifications and by using subjective criteria for promotion. The court reserved judgment, however, on whether maintenance of the group leader classification was discriminatory, advising the parties that it would hear additional testimony on that point as well as on damages at a later hearing.

Following two subsequent hearings, the district court concluded that the maintenance of the group leader position was not discriminatory. It further concluded that additional testimony indicated that Korn was not guilty of racial discrimination in its hiring and promotion practices but that the company had discriminated in making initial job assignments in some instances, for which it would be required to make compensation. Korn was enjoined from violating Title VII and specifically from discriminating on the basis of race in the assignment of jobs to black employees, and was ordered to submit employment reports to the Commission every six months for two years.

In its order following the damages stage of the bifurcated trial, the court noted:

Since the plaintiff made out a prima facie case at the original hearing by use of statistics as to racial discrimination on initial placement of new employees, the burden shifted to the defendant to rebut the statistics by showing the assignment policy does not discriminate according to race.

At the second trial defendant went into great detail in showing the standards used in hiring and initial job assignment. Information as to every new employee was avai[l]able and compared with the criteria of past related work experience, education and unusual physical attributes of strength or height. After weighing this testimony and reviewing the various exhibits the Court is convinced that the defendant has rebutted the prima facie case of racial discrimination except in a few cases where white and black employees were hired at or about the same time with little or no difference in their qualifications and the white was assigned to a higher category than the black. In these cases the court is awarding back pay to the black . . . .

### III.

On appeal, the Commission argues (1) that the trial court erred in concluding that maintenance of the group leader position was not discriminatory; (2) that the court erred as a matter of law in concluding that the liability established at stage one had been rebutted with respect to all except twenty-six employees at stage two of the proceedings; and (3) that even with respect to the named discriminatees, the relief awarded was inadequate because the district court (a) fixed an arbitrary cutoff date for backpay and (b) imposed a fifty dollar

4. Stukes was employed by Korn from 1968 to July 1970, when she took maternity leave. Korn acknowledged that its refusal to rehire her following the birth of her out-of-wedlock child was based on its decision that to do so would cause personnel problems for the company because the father was a married Korn employee. No disciplinary action was taken against the father.

Stukes intervened as plaintiff in the Commission's suit and the trial court found that Korn had discriminated against her on the basis of sex. She and the company were able to reach a settlement on her claim, however, and it is therefore not an issue on appeal.

The trial court also determined that Korn was not guilty of classwide sex-based discrimination in its hiring and promotion policies; that conclusion has not been challenged and hence will remain undisturbed on appeal.

de minimis rule on those awards. We will treat each of these contentions in turn.

## A.

### *The group leader position*

■ The district court concluded that Korn's creation of the group leader position was not discriminatory but was rather "a sincere and effective effort of Korn Industries to train and develop blacks to fill positions of assistant foreman and foreman." Its failure to pay group leaders the production bonuses foremen received was equally nondiscriminatory, concluded the court, because the nature of a group leader's work did not lend itself to a bonus incentive plan.

After reviewing the record, we cannot say that the district court was clearly erroneous in these determinations. Hence, we affirm that portion of its order.

## B.

### *Korn's liability*

■ The district court concluded after stage two of the proceedings that Korn had successfully rebutted the prima facie case of liability established against it during stage one. The Commission asserts this as error as a matter of law, contending that any rebuttal of the prima facie case was proper only during stage one of the trial and that the district court misunderstood the functions of the remedial stage of a bifurcated trial. While recognizing that this case was not tried in the most orderly fashion, we nonetheless conclude that the district court properly allocated the burdens of proof.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court looked at class action procedures for determining liability and relief: the bifurcated proceeding, it concluded, would be the normal means of making those determinations. At the initial stage, the question of liability, i. e., whether the employer had

engaged in a pattern or practice of discriminatory conduct, is addressed. At that stage, the plaintiff[5] is not required "to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy," *id.* at 360, 97 S.Ct. at 1867, but must only establish a prima facie case that such a policy existed. The burden then shifts to the employer to rebut the prima facie case by showing that the plaintiff's proof is "inaccurate or insignificant." *Id.* If it cannot do so, then the court may conclude that a systemic violation has occurred and the plaintiff is at that time entitled to an award of prospective relief, e. g., an injunction against further violations. If relief is sought for individual members of the class, however, the trial is not yet at an end, because a district court will normally have to conduct an additional proceeding to determine the scope of individual relief. At the remedial stage, the force of proof that the employer was guilty of a systemic violation "does not dissipate," *id.* at 361, 97 S.Ct. at 1867, and indeed that proof

> supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. . . . [T]he burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

*Id.* at 362, 97 S.Ct. at 1868 (footnote omitted).

It was not envisioned that the back pay proceeding would be uncomplicated: the district court is required to make individual determinations to decide which of the minority employees have been "actual victims" of the discrimination and it will then have to " 'recreate the conditions and relationships that would have been' " in existence in the absence of unlawful discrimination, *id.* at 372, 97 S.Ct. at 1873, quoting

---

**5.** *Teamsters* was a pattern or practice action; hence the government was the plaintiff.

*Franks v. Bowman Transportation Co.*, 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976), a process which "will necessarily involve a degree of approximation and imprecision." *Id., see also White v. Carolina Paperboard Corp.*, 564 F.2d 1073, 1084 (4th Cir. 1977) ("hypothetical employee" must be constructed).

[redacted] This circuit has recognized that the showing required by *Teamsters* of individual plaintiffs in their quest for damages is not unduly heavy. In *Sledge v. J. P. Stevens & Co., Inc.*, 585 F.2d 625 (4th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979), the court's concern was that the named plaintiffs in the class action should not have had their claims dismissed without being given the benefit of the presumption of discrimination which attaches to individual claims after liability to the class is determined. That benefit means that

> [a]ll an individual plaintiff must ... establish at the second or "back pay" stage of the trial is (a) his identity as one of the presumed discriminatees—that he is black and that during the period in controversy he applied for employment and was not hired, or upon being hired was assigned to one of the low-paying jobs, and (b) any information requested of him to assist the court in determining the amount of the economic loss he suffered as a result. 585 F.2d at 637.

After the plaintiff has met this light burden, the burden shifts to the employer to demonstrate that he had a nondiscriminatory reason for making the challenged employment decision. The claimant must then prove that this stated reason is pretextual or he will be denied compensation. *Id.*

[redacted] In this case, we note preliminarily that the district court's determination of class wide liability has never been challenged. Korn was apparently content to allow the Commission's statistical evidence to go uncontroverted.[6] Particularly when, as here, the statistical proof is buttressed by evidence that employment decisions are based upon the subjective opinions of white management and supervisors, the district court is entitled to adopt the inference of discrimination against the class arising from the plaintiff's prima facie case. *See, e. g., Sledge v. J. P. Stevens & Co., Inc.*, 585 F.2d 625 (4th Cir. 1978); *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975).

Rather, the attack in this case is on the district court's holding after stage two that Korn's evidence on the issue of damages "rebutted" the "prima facie case" of liability made out by the Commission at stage one. Although at first glance this might appear to be an erroneous application of the principle set out in *Teamsters*—that efforts to rebut a prima facie case of class liability are to be made during stage one—we conclude that the district court was guilty of no more than utilizing rather loose terminology. Other language in the district court's opinion indicates that its actual conclusion was that the "rebuttal" was evidence properly offered at stage two to justify assignment decisions in individual cases: the "prima facie case" of liability, i. e., the presumption of discrimination to which class members are entitled, and not the class wide liability, was "rebutted" in specific cases by testimony and other evidence—credited by the court—showing that discrete job decisions were made for lawful reasons. In all but twenty-six cases in which Korn admitted that it could offer no legitimate reason for assigning the black to a lower category than his white counterpart, the district court concluded that Korn had met its burden.

We agree with the district court. The evidentiary basis of its conclusion was Korn's Exhibit 27, which showed all hirings and assignments and the reasons therefor from November 1, 1970, through December 31, 1978; Exhibit 28, which was derived from Exhibit 27; and the testimony of Ronnie Hudson, Korn's general manager. Exhibit 27 depicted the race, name, date of application, date of hire, date of termination, job placement upon initial hire, related

6. Korn's efforts to rebut the Commission's statistical case were meager, consisting primarily of testimony offered to justify assignment differentials in particular cases.

experience, ability to read and write, height and weight, production experience and other comments. Hudson testified that he used the information in this exhibit to match up black and white analogs: if the black was hired into a lower category than a white hired at or about the same time, then he attempted to establish an objective, justifiable reason for the disparity, relying on guidelines that he understood had been established in court.[7] Exhibit 28 listed the twenty-six blacks who had been hired into lower categories than their white counterparts for reasons Hudson testified he could not identify; it also contained Korn's estimate of back pay called for in each case. The Commission cross-examined Hudson extensively about the compilation and content of the exhibits, making use of the supporting personnel files which Korn had in the courtroom. It did not, however, offer evidence in rebuttal.

Our reading of the transcript and a review of Exhibit 27 convince us that the district court acted in accordance with the standards set out in *Teamsters* and *Sledge*: it awarded relief to those individuals with respect to whom Korn could not rebut the inference of discrimination, and it refused to award relief in those cases in which it was satisfied that Korn had rebutted the inference.

In all candor, we think the Commission protests too much that the district court's limitation of back pay to twenty-six employees was erroneous. The record indicates that the Commission was clearly not interested in participating in a case-by-case determination of damages but instead proposed what the district court accurately characterized as an "absurd" theory of class damages: this theory apparently contemplated a lump sum award to the group to be distributed in some unascertained fashion among the affected blacks.[8]

■ Furthermore, although the Commission makes much of the trial court's reliance on the exhibit which Korn itself had compiled, it should be noted that the Commission was particularly unhelpful to the court in this regard. Although Korn made its employment records available, the Commission never utilized those records or sought in any way to prove that Korn's stated reasons for assigning blacks to particular categories were pretextual although they had ample time in which to do so. In short, although Korn "articulate[d] some legitimate, nondiscriminatory reason" for all except twenty-six of its assignment decisions, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Commission chose not to attempt to prove that the reasons offered were not Korn's true reasons. According to prevailing standards of proof, the trial court was entitled to limit relief to the twenty-six individuals with regard to whom Korn did not meet its burden.

### C.

### *Adequacy of the relief awarded*

■ The court awarded back pay in differing amounts to twenty of the twenty-six black employees with respect to whom Korn could not disprove the claimed discrimination. To those twenty, the court awarded the difference between their initial hourly

7. Korn and the Commission attempted unsuccessfully to settle this lawsuit, even going so far as to agree on guidelines to be used in making determinations of individual liability. In this one-on-one procedure, the parties planned to focus on the actual job requirements, i. e., related experience, education and physical requirements, in assessing who was qualified for assignment to a given category. Upon reconsideration, the Commission decided that it could not agree with the criteria established for the settlement. Hudson testified that Exhibit 27 was compiled with these guidelines in mind.

8. The Commission's theory, although difficult to fathom, appears to run along the following lines. First, calculate the amount the black employees would have received had they been hired into category four. Subtract from this amount the sum actually received by all black employees hired into categories one, two and three. The remaining sum would be the pool, to be divided among class members. The Commission was less than clear at trial in explaining the mechanics of the proposed distribution.

pay rates and the initial hourly pay rates of their white matches, i. e., the white employees with the same qualifications who were hired at or about the same time into a higher category, with the awards to be cut off at the date of the black employee's termination, or his promotion to the same level as the whites, or until December 31, 1978, whichever came first. The court established a de minimis rule, however, that Korn would not be required to pay awards of less than fifty dollars: the court's justification for the rule was that "[i]f the amount involved does not exceed $50 the expense of finding and paying the former employee would more than exceed the award and in a number of cases the black employee may have worked only a day or so." The Commission challenges both the adequacy of the awards and imposition of the de minimis rule. We are persuaded that both challenges have merit.

Turning first to the adequacy of the awards, we conclude that the district court's failure to adhere to the principles set out in this circuit's opinions in *White v. Carolina Paperboard Corp.*, 564 F.2d 1073 (4th Cir. 1977), and *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976), *remanded on rehearing on other grounds*, 634 F.2d 744 (1980), *cert. granted*, 452 U.S. 937, 101 S.Ct. 3078, 69 L.Ed.2d 951 (1981), requires a remand for recalculation of back pay claims.

The back pay provision in Title VII has two objectives, "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). This circuit has attempted to fashion guidelines for calculating make whole back pay relief. In *White v. Carolina Paperboard*, 564 F.2d at 1084, the court advised that the appropriate means of determining the effects of discriminatory actions is to construct a "hypothetical employee" and to follow him as he advances through the company's ranks. This allows a reconstruction of the average progression in the company. The court not-

ed that after reconstructing the affected black employee's hypothetical employment history, the trial court is to compare it with that employee's actual employment position and is to make an award based on the difference. *Id., see also United Transportation Union, Local 974 v. Norfolk and Western Railway Co.*, 532 F.2d 336, 341 (4th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976).

The district court in this case awarded the amount of the starting pay differential between the black employee and the white counterpart and terminated the award at an arbitrary point a year and a half prior to judgment, or at the time the black employee was promoted to the same level as the white employee or was terminated, whichever came first. No effort was made to insure that the discriminatee's economic progress mirrored that of an average employee's: the calculations did not take into account any across the board pay raises that might have been granted or Korn's merit increases, which are granted so automatically that they are no more than time in grade increases.

Moreover, the court allowed the awards to terminate when the black employee had reached the starting point of the white employee with similar qualifications hired at the same time; this failed to make adjustment for the relative disadvantage of the black employee with respect to the white employee. Further, we can find no justification in the record for cutting off the awards at an arbitrary date long prior to judgment. The date may have been one which the parties agreed to while attempting to work out a settlement or it may reflect the time when Korn's amended affirmative action program went into effect. Neither hypothesis would be sufficient to halt awards as of that date. This circuit has held that back pay must be allowed from the time an employee is denied an employment opportunity until he actually receives it. *See Patterson v. American Tobacco Co.*

Accordingly, on remand the district court shall apply the principles expressed in *White v. Carolina Paperboard Corp.* and *Patterson* and shall construct a hypothetical employment history for each of the twenty-six discriminatees, against which it will compare the actual employment history of each; the back pay award will be the difference between the hypothetical employee's earnings and the individual's actual earnings. Additionally, the award shall not be limited by an arbitrary cut off date but shall instead continue until the time the employee is promoted to the job to which his qualifications and history indicate he is entitled.

Further, we hold that the imposition of a fifty dollar de minimis rule was an abuse of discretion in this case. While it is true that district courts have great discretion in fashioning the equitable remedy of back pay, *see City of Los Angeles v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), that discretion is not unlimited in light of the presumption favoring the award of back pay. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

The injury to each employee discriminated against in this case occurred at the time of his job assignment to a lower paying position than his white counterpart. That injury was to a substantial right and we are aware of no principle that would permit it to go uncompensated merely because the ultimate economic damage was less than fifty dollars. *See generally Jenkins v. United Gas Corporation*, 400 F.2d 28, 32 (5th Cir. 1968) ("what is small in principal is often large in principle"). Certainly a concern that the employer, who has been adjudicated guilty of racial discrimination, may have to expend more than the amount of the award itself to locate a victim of its discrimination is not an adequate justification for limiting the award. Employees are to be made whole for injuries suffered through past discrimination, see *Albemarle Paper Company v. Moody*, 422 U.S. 405, 418–21, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280; *see also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1967), and make whole relief is not limited to those with large claims.

Accordingly, on remand, no arbitrary limit shall be placed on back pay claims.

### IV.

Therefore, although we affirm that portion of its orders concerning Korn's liability, we remand this case to the district court for a recalculation of damages in accordance with the principles set out in this opinion.

*AFFIRMED IN PART, REMANDED IN PART.*